## Staunton

PAUL C. EDMUNDS, SR. v. SAM E. CHANDLER, COMMITTEE OF HATTIE LEE CHANDLER, ET AL.

August 31, 1962.

Record No. 5449.

Present, Eggleston, C. J., and Spratley, Buchanan, Snead, I'Anson and Carrico, JJ.

*Edwin B. Meade* and *James E. Edmunds*, for the appellant.

*John W. Carter* (*Carter & Carter*, on brief), for the appellees.

SNEAD, J., delivered the opinion of the court.

This appeal resulted from the entry of two decrees. In the first decree, dated August 3, 1961, the chancellor determined, among other things, that two option and lease agreements between Hattie Lee Chandler, owner of the premises, and Paul C. Edmunds, Sr., lessee, were null and void for the reason that Miss Chandler lacked mental capacity to execute the agreements and bind herself, and that since Edmunds, appellant, acted throughout the negotiations in good faith he was entitled to be placed *in statu quo*. The second decree, dated September 25, 1961, denied the prayer of Edmunds' petition for a rehearing.

On March 13, 1961, Sam E. Chandler, committee of Hattie Lee Chandler, filed his bill of complaint against Paul C. Edmunds, Sr., Louise B. Edmunds, his wife, and W. E. Graham & Sons Division of Vulcan Materials Company, hereinafter called Graham. The bill prayed for the rescission of two option and lease agreements for quarrying purposes, dated March 17 and September 1, 1960, entered into between Miss Chandler, owner of a 77.92-acre farm, and Edmunds, lessee. The relief sought was upon the ground that Miss Chandler was not mentally capable of entering into a valid and binding contract on the dates of the execution of the two agreements, and upon the additional ground that Edmunds failed to disclose to Miss Chandler facts known to him and unknown to her which, because of the relationship between them, he was duty bound to disclose. The bill further prayed that the quarrying operations of Graham, which company had subleased the property from Edmunds on a royalty basis of 5 cents per ton, be not disturbed during the pendency of the litigation, but that all royalties which might accrue to Edmunds under the sublease be paid into court until the controversy was decided.

Graham, in its answer filed to the bill, stated, *inter alia*, that the prayer of the bill did not appear to contemplate affecting any of its rights and asked to be dismissed. In a separate answer, Edmunds denied the incapacity of Miss Chandler and also the charges made against him. The answer of Mrs. Edmunds is not in the record before us. The decree indicates that such was filed, and appellant says in his brief that it stated she was made a party defendant solely because she had executed the sublease of the option and lease agreements along with her husband.

The evidence was heard *ore tenus* and it disclosed these facts:

For several years a rock quarry with rock suitable for highway construction purposes had been sought in Halifax county by interested persons to supply the needs for anticipated extensive road construction in the vicinity. Edmunds, who was not a quarry operator, and two large competing quarry companies, Graham, and Superior Stone Company, were searching for such stone. Edmunds, a resident of the county, had been working in close association with officers of Graham for some time in an effort to secure the rock for Graham. Edmunds was informed that there was rock in the creek bed on Miss Chandler's farm. After having been shown it by W. A. Chandler, father of Hattie Lee Chandler, Edmunds returned at a later date and discussed with him, his wife Nancy and Miss Chandler the possibility of securing an option to lease the farm for quarrying purposes and terms were agreed upon. Edmunds returned to the farm on March 17, 1960, with a prepared option and lease agreement dated the same day. While there he learned that the property was owned by Chandler's daughter, Hattie Lee Chandler, instead of Chandler, and the agreement was then changed to conform and was executed. According to Edmunds, he read the agreement to the Chandlers before it was signed. Miss Chandler, who was age 44, willingly signed the document by an "X" mark, witnessed by her father and Herbert Owen. Her mother was also present during the transaction. As agreed to, the contract was left with an officer of a local bank, who was a notary public, before whom Miss Chandler appeared on March 25 and acknowledged her signature.

This agreement, for a consideration of $25, gave Edmunds, among other things, an option to lease the farm for quarrying purposes before April 2, 1961, for a period of 10 years for the sum of $2,000 with an option for an additional 10 year term for a like sum. At this time no one knew the potentialities of the rock.

In the latter part of August, a report on a core test of the rock was favorable, and Graham, sublessee of Edmunds, desired an enlarged option for a total of 40 years, in terms of 10 years each. Whereupon, Edmunds prepared another option and lease agreement, dated September 1, 1960. It provided for the payment of $25 for the option, $2,000 for the first 10 year term, and an option for three additional 10 year terms for $2,000 each. The contract further provided for the additional payment of $100 for each year rock was quarried. Edmunds took the new agreement to the Chandler farm and there discussed with Miss Chandler, her father and mother its

purpose. The evidence was conflicting as to what was said at the time. In any event, it was executed by Miss Chandler by making an "X" mark, witnessed by her parents. She later acknowledged her signature before the same notary that had taken her acknowledgment to the first agreement.

Further tests showed that the rock on the Chandler farm was grade A. The adjoining farm, owned by C. B. Glascock, had the same strata of rock with less overburden. Graham secured an option to lease it for 5 years without right of renewal. Edmunds, who had subleased his rights to Graham under the Chandler agreements, declined to grant Superior Stone Company an option on his dairy farm because of his close association with Graham.

On November 3, Edmunds notified Miss Chandler by letter that he was exercising the option and enclosed his check payable to her for $2,000, and Graham began operations on the Chandler farm instead of the Glascock farm. At the time of the trial results of the operations exceeded expectations. On November 25, Edmunds mailed his check for $100 for the first year's operations. These checks were not cashed and were subsequently deposited with the court, along with $50, representing the two $25 payments made for the options, when this suit was commenced.

In December Miss Chandler was examined by Dr. Merritt Foster, a psychiatrist in Richmond. As a result of his findings, the complainant, Sam E. Chandler, was appointed and qualified as committee of Hattie Lee Chandler, his sister, on February 2, 1961. This suit followed.

The record shows that when Miss Chandler was 5 years old, she fell from a fence and injured her head. Thereafter she did not mature mentally. She was not capable of completing the first year in school. She cannot read, write or sign her name.

She worked in a cotton mill in the vicinity for a period of eight years and saved her earnings to purchase a home for herself. She and her mother negotiated for the purchase of the farm in 1947. Miss Chandler bought it for $6,400, and $3,250 of the purchase money was borrowed by her from a local bank. The deed of trust securing the loan was prepared by an attorney-officer of the bank and Miss Chandler signed it by mark. Between 1952 and 1959 she, with the assistance of her mother, sold and conveyed three lots from the farm to separate purchasers and also executed two right of way agreements to the Virginia Electric and Power Company.

Edmunds did not know Miss Chandler prior to his visit to the

farm in February, 1960. All of his transactions with her were in the presence of her parents and met with their approval at the time. At no time did they indicate to him that they thought Miss Chandler was not mentally capable of transacting business.

Dr. Foster testified that Miss Chandler had an intelligence quotient of 51, which places her in the category of moderately severe mental deficiency. He fixed her mental age at seven years, and stated that in his judgment she was incapable of entering into business transactions or of understanding legal phraseology in a formal agreement. The testimony of a number of lay witnesses supported Dr. Foster's opinion that Miss Chandler lacked mental capacity to transact business. On the other hand, there was testimony of lay witnesses tending to show to the contrary. It will serve no good purpose to relate what they said.

On May 12, 1961, the court advised counsel by letter that it had determined that the two option and lease agreements were null and void at the option of the complainant and should be rescinded on the ground that Miss Chandler was not competent to execute them, and that Edmunds had acted in good faith and "must be put back in *statu quo* as the bill offers to do". The court suggested that the committee and Edmunds work out a just and equitable contract and file a petition under the statutes for the sale or lease of incompetent's lands, because Edmunds had rendered valuable services and could continue to do so for the incompetent. No such contract could be agreed upon.

Edmunds then filed a petition asking the court to reconsider its decision and to determine that Miss Chandler had mental capacity to execute the option and lease agreement of September 1, 1960, and to further determine that she was entitled to 2 cents for every ton of rock quarried and sold, in addition to the sums mentioned in the agreement, in accordance with his [Edmund's] promise to pay during his testimony at the trial and which he says was also made prior to and after the execution of the agreement of September 1. His alternate motion was that fair and reasonable compensation be allowed him for services rendered the incompetent.

After a consideration of the petition, the court advised counsel by letter that it adhered to its former opinion as to the incapacity of Miss Chandler; that the only relief the court could grant Edmunds was to place him *in statu quo*; that to do so $1,000, in addition to a refund of all moneys paid under the agreements, would be adequate; and that since the contract was void in its inception, Edmunds was

a mere volunteer and as such was not entitled to a recovery on a *quantum meruit* basis.

The decree of June 22, 1961, embodied the views expressed in the letter opinions. This was followed by a petition for a rehearing in which Edmunds asked that the decree be modified to hold that the agreements were voidable rather than void, and thus avoided only upon placing him *in statu quo*, by awarding him such amount as the court deems proper under the evidence. The prayer of the petition was denied by decree of September 25. We granted Edmunds an appeal.

Edmunds has resolved his assignments of error into the following three primary questions:

"(1) Was Hattie Lee Chandler incompetent to execute with Paul C. Edmunds, Sr., the option and lease agreement dated September 1, 1960?

"(2) If she was incompetent, can Paul C. Edmunds, Sr. be placed *in statu quo* so that she may be allowed to rescind said agreement?; and

"(3) If she is allowed to rescind, to what relief is Paul C. Edmunds, Sr. entitled under all the facts and circumstances of this case?"

 The principle is well settled that where a chancellor hears evidence *ore tenus*, his conclusion on conflicting evidence has the same weight as that of a jury, and is binding on us unless plainly wrong or without evidence to support it. *Williamson* v. *Johnson*, 164 Va. 632, 636, 180 S. E. 310; *Pretlow* v. *Hopkins*, 182 Va. 826, 829, 30 S. E. 2d 557; *Rogers* v. *Runyon*, 201 Va. 814, 816, 113 S. E. 2d 679.

Here, the evidence was conflicting as to whether Miss Chandler lacked mental capacity to execute the option and lease agreements and bind herself. It was the chancellor's province to determine the credibility of the witnesses from their demeanor on the stand; their opportunities to be informed about the subject matter; their apparent candor and fairness, and their manner of testifying. The determination by him that Miss Chandler was incompetent is a finding of fact, which was supported by credible evidence, and we cannot disturb his decision.

 Edmunds contends that even if it be determined that Miss Chandler was incompetent, the contract cannot be rescinded because he cannot be placed *in statu quo*.

"* * * [A]ccording to the weight of authority, a contract made by a person who is in fact mentally incompetent, but has not been so adjudicated, is voidable but not void. * * *." 29 Am. Jur., Insane Persons, § 93, p. 214.

"The fact that a contract is executed does not of itself preclude its avoidance on the ground of the mental infirmity of a party thereto. The great weight of authority, however, supports the rule that where a contract with an insane person has been entered into in good faith, without fraud or imposition, for a fair consideration, of which the incompetent has received the benefit, without notice of the infirmity, and before an adjudication of insanity, and has been executed in whole or in part, it will not be set aside unless the parties can be restored to their original position. * * * The courts have made reasonably clear the judicial concept which motivates the enforcement of the contracts of an insane person in such situations. They are enforced against the insane person, not because such agreements possess all the legal characteristics of a binding contract, but primarily because the insane party has secured a benefit in the transaction which it would be inequitable to allow him to retain, without first restoring to their original position those who conferred such benefit, or with whom he entered into the agreement. Stated differently, it is grossly unfair to allow a person to repudiate a contract without returning, or offering to return, the benefits which he received thereunder. * * *." 29 Am. Jur., Insane Persons, § 95, pp. 215, 216.

In *Jackson* v. *Counts*, 106 Va. 7, 12, 54 S. E. 870, 872, we stated:

"The general doctrine seems well settled that where the grantee knows that the person with whom he is dealing is laboring under mental disability and overreaches him, he is not entitled to reimbursement or indemnity on account of the price paid. But the rule is otherwise where he deals fairly with the person under disability, without knowledge of his misfortune, in which case the purchaser must usually be placed *in statu quo*. The above rule, however, is not inflexible, and is largely influenced by the facts of the particular case." (Citing cases.)

But whether the contract was void *ab initio*, as the chancellor decided, or voidable is of no consequence here, because the bill offered to place Edmunds *in statu quo* and the chancellor decreed this should be done.

In order to place a party *in statu quo*, he should be restored to the same position he was in at the time of the execution of the con-

tract. Absolute and literal restoration is not required. Restoration that is reasonably possible and demanded by the equities of the case is enough. *O'Keefe* v. *Routledge*, 110 Mont. 138, 146, 103 P. 2d 307, 310; *Black Motor Co.* v. *Green*, 258 Ky. 72, 76, 79 S. W. 2d 409, 411; 17 C. J. S., Contracts, § 438, p. 920; 12 C. J. S., Cancellation of Instruments, § 44c, p. 1010.

In 29 Am. Jur., Insane Persons, § 95, at p. 217, it is stated:

"In order to place a person who has performed a contract, made by him with an insane person, in statu quo, all moneys necessarily, properly, and judicially expended in procuring the contract, or as a legitimate expense in connection therewith, and paid out in good faith, must be repaid. But only such expenditures as were incident to the obligations and duties implied or specifically imposed in the contract need be repaid. Extraneous and entirely disconnected expenditures are not required to be repaid as a prerequisite to rescission. * * *."

Edmunds says that the return to him of all moneys advanced to Miss Chandler plus $1,000 decreed by the chancellor "falls far short of the legal requirements prerequisite to the cancellation" of the agreement. He points out that when the bid for the construction of a section of Highway 304 was imminent and Superior Stone Company, a competitor of Graham, was anxious for a lease of rock on his dairy farm located near the scene of the proposed construction in order to meet competition of Graham for a low bid for rock to be used, he declined to lease his farm to Superior. Instead he successfully urged his friend, P. C. Nichols, Jr., district sales manager for Graham, who recognized the company's obligation to him [Edmunds], to recommend opening its quarry on the Chandler farm rather than the adjoining Glascock farm and his recommendations were followed. Thus, he says, he cannot be placed *in statu quo*, because it is not possible to restore him to his original position with all opportunities available to him just prior to his refusal to lease his farm to Superior.

We find this contention without merit. What the results would have been had Edmunds leased his property to Superior is too speculative to be included as an item to be considered in placing him *in statu quo*. It is not essential that restoration be absolute and literal in order to place a party *in statu quo*. Moreover, this item is remote and disconnected from the Chandler contract itself, because Edmunds rejected Superior's offer on the basis of his relationship with Graham.

He said: "I finally decided I had worked so closely with the Graham people, I couldn't do business with them."

As has been said, the chancellor allowed Edmunds $1,000 for moneys judiciously expended in procuring the option and lease agreements. Just how he arrived at this figure is not shown by the record. However, complainant makes no issue of this allowance. Edmunds claims he is entitled to additional compensation for his services and efforts in prevailing upon Graham to locate on the Chandler farm. Here again the record is devoid of any evidence showing the value of such services. The chancellor properly refused to grant Edmund's motion to enforce his oral promise to pay Miss Chandler 2 cents per ton royalty in addition to other payments specified in the written contract. It has not been shown that he is entitled to more than $1,000 to place him *in statu quo*. Having placed Edmunds *in statu quo*, the trial court was correct in not allowing him compensation on *quantum meruit* basis.

The complainant assigned as cross-error the chancellor's factual finding that Edmunds acted in good faith throughout the negotiations with Miss Chandler instead of finding that there was constructive fraud. This assignment of error is without merit as the evidence supports the chancellor's conclusion.

We find no reversible error in the decrees appealed from and they are

*Affirmed.*