A & E SUPPLY CO., INC., Plaintiff,

v.

NATIONWIDE MUTUAL FIRE INSURANCE CO., Defendant.

Civ. A. No. 81–0140 B.

United States District Court,
W.D. Virginia,
Big Stone Gap Division.

June 21, 1985.

E.K. Street, Thomas Scott, Grundy, Va., for plaintiff.

Howard C. Mc Elroy, Abingdon, Va., for defendant.

## MEMORANDUM OPINION

GLEN M. WILLIAMS, District Judge.

This is a suit to recover damages for fire loss from the insurer. The plaintiff, A & E Supply Company, Incorporated (A & E), seeks both compensatory and punitive damages. Originally instituted in Buchanan County, Virginia, this diversity action was removed before the Virginia Supreme Court announced its decision in *Kamlar Corp. v. Haley*, 224 Va. 699, 299 S.E.2d 514 (1983). Prior to trial, A & E moved this court for leave to amend its complaint to comply with *Kamlar*. *Kamlar* allows a

plaintiff to set forth, in separate counts, allegations of independent, willful torts in order to support an award of punitive damages. *Id.* The court initially denied the motion to avoid further delay in bringing the case to trial. However, when the trial was continued by agreement of the parties, A & E was permitted to amend to allege independent, willful torts if said torts were supported by the facts alleged in the original complaint.[1]

Partial summary judgment was granted to A & E prior to trial because Nationwide had already paid the claim of Borg-Warner Acceptance Corporation, a co-loss payee named in the insurance contract. The court held that payment to a co-loss payee waived the defenses of arson and misrepresentation. *A & E Supply Company v. Nationwide,* 589 F.Supp. 428 (W.D.Va. 1984). The total coverage of fire insurance on the building was $150,000. Nationwide paid the mortgagee named in the policy the sum of $117,930.21, leaving a balance of $32,069.79 as the maximum amount A & E could recover in actual damages for its loss. The total fire loss coverage on the contents of the building was $250,000. Of this amount, Nationwide paid Borg-Warner the sum of $61,033.91, leaving a balance of $188,966.09 as the maximum that A & E could recover for the loss of the contents. The jury was instructed that the most A & E could recover as compensatory damages was $32,069.79 for damage to the building and $188,966.09 for damage to its contents, a total of $221,035.88. The jury awarded the full amount of compensatory damages and also awarded the entire amount sought for punitive damages, $500,000.

Nationwide admitted at trial that the lost value of the building exceeded the amount of coverage. Therefore, there was no question that the sum of $32,069.79 was justified as an award for the balance of the loss of the building. The value of the building's contents was disputed. This dispute raised the question of whether goods and contents alleged to have been in the building at the time of the fire were actually there. Evidence of an overvalued inventory was used to support Nationwide's theory that the crime of arson had been committed by the owners. The issue of arson was thus placed directly before the jury. The verdict was based on certain interrogatories submitted by the court. The jury was required to find the amount of the actual loss of the building and the actual loss of its contents to arrive at the total for which compensatory damages were awarded. The court also asked the jury to decide whether the defendant had committed the torts of conversion, fraud or bad faith and whether the defendant had committed specific practices prohibited by the Unfair Trade Practices Act of Virginia.

This case is now before the court on Nationwide's motion for judgment notwithstanding the verdict or for a new trial. The motion is based on the following arguments: (1) that there was no finding, and indeed no proof, of compensatory damages for the separate independent torts and that punitive damages could not be awarded absent a finding of compensatory damages for the torts, (2) that A & E failed to prove the specific torts, (3) that the tort of bad faith is not legally cognizable in Virginia, (4) that, under Virginia Law, there is no implied private right of action for a violation of the Unfair Trade Practices Act, (5) that there was insufficient evidence to award punitive damages for lack of evidence showing actual malice or willful or wanton disregard by Nationwide of A & E's rights, (6) that there was no proof that

---

1. Among the separate independent, willful torts pled by A & E in the amended complaint was the tort of slander. The court denied the motion to allow the allegation of slander because it was not mentioned in the original suit. Slander was proven by strong evidence and the court is now of the opinion that error was committed by not permitting A & E to amend its complaint in view of the change made by the *Kamlar* decision. There was undisputed evidence that the defendant, Nationwide Mutual Fire Insurance Company, told creditors that A & E had deliberately burned its building to collect on the insurance policy. It was further shown that this slander was damaging to A & E, preventing the commencement of any new business and severely limiting its ability to obtain credit.

Nationwide authorized or ratified the acts upon which A & E based its claims for the various torts, (7) that the punitive damages award was excessive and (8) that the evidence did not justify a finding of compensatory damages.

## STATEMENT OF FACTS

In the late evening of Sunday, October 27 and continuing into the early hours of Monday, October 28, 1980, a fire completely destroyed the building and the contents of A & E Supply Company (A & E), a Virginia corporation, located in Buchanan County, Virginia. A & E was owned and operated by two brothers, Terry Lee Fletcher and Larry Fletcher. A & E was organized and incorporated in January, 1979 and operated as a mine supply business. During its operation, A & E grew from monthly sales of $50,000 in January, 1979 to monthly sales of $275,000 for September, 1980. In the interim, during peak months sales had run as high as $334,000 per month. A & E's corporate fiscal year ended in November. At the direction of A & E's certified public accountant, an end of year inventory, which was almost 95% complete, was being conducted at the time of the fire. This inventory was introduced into evidence as Plaintiff's Exhibit Number 2; it recorded the amount that had been physically counted and projected the items which had not been counted. The total value of the recorded and projected inventory was $365,000, whereas the amount of insurance on the inventory was only $250,-000.

Among the items shown on the inventory sheet were many highly inflammable items which would normally be totally destroyed in a fire. These included rubber tires, rubber rainsuits, plastic pipe, rubber splicing kits, rosin glue, rags, vinyl electric tape, rubber tape, paint, oil and grease, transmission fluid, rubber knee pads, compressed oxygen, rubber mine hose, etc. In addition to the inflammable items were items which would melt, such as bags of calcium chloride. There were, of course, numerous items which would not be consumed by fire, including copper wire, cables, metal buckets and items of that kind.

A & E's building was of double masonry wall throughout, consisting either of double brick or single brick and cinder block. The roof of the building was supported partly by metal I-beams and partly by wood rafters. Part of the roof was tin and part was tarpaper. During the course of the fire, the roof collapsed. Witnesses testified that a large area collapsed all at one time. This area was "almost the entire width of the structure and probably over half of its length." (Transcript I at 50). The portion that first collapsed was over the back of the building and later another part of the roof over the front of the building collapsed. In the areas where the roof collapsed, it covered the floor until the time this case was being tried and made any effort to take an inventory most difficult, if not impossible. It was, of course, impossible to count any items which melted or which were inflammable and burned completely. Therefore, it was impossible to take an accurate inventory after the fire.

Many of the business records of A & E were destroyed by the fire. A & E later received certain cancelled checks and turned those over to Nationwide. They partially reconstructed the accounts receivable and accounts payable. Nationwide was provided an "aging sheet" which was current through September 30 but did not record the sales during the month of October. The accounts receivable at the end of September, according to the aging sheet, were $342,708. A & E was able to reconstruct $161,000 of invoices which had been given to customers and turned that information over to Nationwide. A & E contacted their suppliers after the fire, arranged to obtain records of what was owed to the suppliers and turned those records over to Nationwide. Individual tax returns of A & E's owners were furnished to Nationwide. The insurance company refused to return the records to A & E even though they were requested many times. Nationwide advised A & E that it would be detrimental to its case to return any of the material

requested. A & E was unable to complete its tax returns and got records from Nationwide only a few weeks prior to trial pursuant to a court order. The evidence is undisputed that A & E had made a written demand upon Nationwide which was specifically denied by a letter from District Claims Manager Robert Allen, who advised that the records would not be returned because it would be contrary to the best interests of Nationwide.

The only evidence placing any employee or either owner of A & E near the building for at least 48 hours before the fire showed that one employee entered the store on Saturday morning to make a delivery. The business was closed on Friday afternoon and the fire occurred on Sunday night. Nationwide produced no evidence, either by eyewitness testimony or circumstantial evidence, to show any opportunity of A & E's principals or agents to set the fire. Indeed, Nationwide made no attempt to confirm or refute the testimony of A & E's officers and agents about where they were before the fire.

After the fire, A & E forwarded its largely completed year-end inventory to Borg-Warner Acceptance Corporation. Borg-Warner furnished a copy to Nationwide and, in reliance thereon, some seven months after the fire Nationwide paid Borg-Warner as a loss-payee. Nationwide, however, refused to accept the inventory when considering payment of A & E's claim. Instead, they relied upon a physical count inventory taken at the scene of the fire despite the facts that the roof had fallen, making it impossible to inventory the items which were in areas where the roof had collapsed, and that a physical count was impossible because items were completely consumed by the fire.

Nationwide immediately employed Double K Investigative Services to determine the cause and origin of the fire. Kenneth Collins and Kenneth Riddleburger conducted the investigation. They determined that the fire originated in the left rear corner of the building and was caused by accelerants being poured on a concrete floor and ignit-

ed. There were numerous eyewitnesses present at the scene immediately after the fire was discovered who unanimously testified that the first visible fire was in the front of the building near some electrical switch boxes. An outside clock had stopped at 9:15. The clock was wired to a switch box in the area where fire was initially discovered by the first people who arrived at the scene. None of the witnesses who observed the fire closely saw any fire where Nationwide's investigators placed the origin. Only one witness supported Nationwide's claimed point of origin; that was a woman who lived across the street. She was observing the fire from that vantage point when it first broke through the roof. The investigators for Nationwide immediately decided that arson had been committed. However, neither Nationwide nor its agents reported arson or the suspicion of arson to the proper law enforcement agencies as required by the Arson Immunity Reporting Act. Instead, Nationwide concealed what it contended was a crime and thereby prevented competent arson investigators, fire marshals and other law enforcement officials from making a full investigation. While Nationwide had already decided to contend that arson had been committed, they represented that a settlement would be forthcoming if A & E would forward its financial records. Despite the fact that Nationwide from the beginning had no intention of paying the claim, they did not notify A & E until well into November that they suspected arson.

Although A & E had been having a cash flow problem and at times lacked sufficient funds to pay all its debts, it had an understanding with the bank that checks would be held until deposits were made to cover payment. After the fire, Nationwide submitted letters to the bank, Borg-Warner and various suppliers accusing A & E of committing arson. That put A & E in a position of being unable to get credit. The effect of these letters was to create a powerful incentive to force A & E to settle for a sum substantially less than the policy limits in order to avoid the cost of litigation. By the same token, Nationwide de-

layed payment to Borg-Warner for a period of seven months and delayed paying Cumberland Bank and Trust Company which had a mortgage on the realty. Nationwide also cancelled A & E's policy, making it difficult for them to obtain insurance elsewhere.

At trial, Nationwide, through its own accountant and other witnesses, admitted that its physical count inventory, the basis for all the accounting data which it had assembled, was inaccurate. In addition, Nationwide waited until the time of trial to stipulate that the damage to the structure exceeded the policy limits, notwithstanding its own real estate appraiser's opinion to that effect, which Nationwide had received well in advance. Not only did all eyewitnesses who were close to the fire dispute the point of origin determined by Nationwide's experts, but the plaintiff presented overwhelming evidence that the fire began in the front of the building as the result of short circuits in the electrical wiring.

In May, 1981, Nationwide offered to pay A & E the sum of $232,000; A & E refused that offer. Shortly after A & E refused the offer to settle, a letter was issued by Nationwide denying the claim. The May, 1981 offer was the first and only offer made by Nationwide to A & E.

## WHERE COMPENSATORY DAMAGES ARE SOUGHT AND OBTAINED FOR BREACH OF CONTRACT, IS IT ALSO NECESSARY FOR COMPENSATORY DAMAGES TO BE AWARDED FOR THE SEPARATE AND INDEPENDENT TORTS WHICH ARE ALLEGED IN CONNECTION WITH THE BREACH OF CONTRACT IN ORDER TO RECOVER PUNITIVE DAMAGES?

As previously noted, A & E's recovery was $32,069.79 for the building and $188,966.09 for damage to contents. These amounts represent the difference between what was paid to the mortgagee and loss-payee, respectively, and the total amount of insurance. No compensatory damages were sought in the amended complaint for any injury due to tort. Separate and independent torts were alleged in order to support a claim for punitive damages, as required by *Kamlar.* 224 Va. at 699, 299 S.E.2d 514. There is no question that Virginia Law requires that compensatory damages be awarded before there can be an award of punitive damages for the torts. *Zedd v. Jenkins,* 194 Va. 704, 74 S.E.2d 791 (1953). Defendant contends that when a suit is brought for breach of contract and separate counts allege willful independent torts, there must be additional injury, separate and apart from damages caused by the breach, resulting from the independent torts before punitive damages can be awarded in the breach of contract action. *See Moffet v. Kansas City Fire Marine Insurance Co.,* 173 Kan. 52, 244 P.2d 228 (1952). Thus, the defendant argues that even if independent torts were alleged and proven, no injury or damages were proven to have resulted from the separate independent torts so punitive damages cannot be awarded.

The answer to this question lies in the interpretation of *Kamlar Corp. v. Haley,* 224 Va. at 699, 299 S.E.2d 514. Prior to *Kamlar,* the United States Court of Appeals for the Fourth Circuit had interpreted Virginia Law to be that punitive damages would be available for breach of contract where the breach amounted to an independent willful tort due to malicious, wanton or oppressive behavior by the breaching party. *See Matney v. First Protection Life Insurance Co.,* 73 F.R.D. 696 (W.D. Va.1977); *National Homes Corp. v. Lester Industries, Inc.,* 336 F.Supp. 644 (W.D.Va. 1972). In a contract action by the United States against a former C.I.A. agent for breach of a secrecy agreement, the Court of Appeals stated that punitive damages could be recovered "where the acts constituting the breach also constitute the commission of a tort or are closely analogous thereto." *United States v. Snepp,* 595 F.2d 926, 936 (4th Cir.1979) *aff'd in part, reversed in part on other grounds,* 444 U.S. 507, 100 S.Ct. 763, 62 L.Ed.2d 704

(1980). The cases cited adhere to the rule of *Wright v. Everett,* 197 Va. 608, 90 S.E.2d 855 (1956).

It is obvious that the law as expressed in *Kamlar* by the Supreme Court of Virginia was not the law prior to the October 1, 1977 change in the Code of Virginia expressly permitting the joinder of tort with contract in a single pleading. Va.Code § 8.01–272 (1984 Repl.Vol.). *Kamlar,* therefore, marked a significant change in Virginia Law. *Kamlar* specifically recognized that since the law no longer required an election between tort and contract, a plaintiff seeking punitive damages in a breach of contract action could support the punitive damages claim by alleging a "wilful, independent tort." The court said:

> [A] Plaintiff seeking punitive damages should allege a wilful, independent tort in a count separate from that which alleges a breach of contract. This serves to notify the defendant of the precise allegations he must meet at trial to resist that part of the claim which supports punitive damages. It also permits that aspect of the case to be tested separately from the rest, upon demurrer as to the sufficiency of the pleadings and upon a motion to strike as to the sufficiency of the proof.

224 Va. at 707, 299 S.E.2d at 518.

It is important to note what the court did not say; it did not require proof of damages from the separate independent tort nor did it require a plaintiff to seek compensatory damages for the separate independent tort. *Kamlar* holds that, in order to obtain punitive damages, one must allege and prove a separate independent tort. The dissenting opinion clarifies the holding of the majority. It is the court's understanding, based upon the majority opinion as modified by the dissent, that Nationwide's reliance on *Kamlar* is misplaced. The dissenting opinion states as follows:

> [T]he majority now says that the rule of [*Wright v. Everett* ] 'require[s] proof of an independent, wilful tort, beyond the mere breach of a duty imposed by contract, as a predicate for an award of

punitive damages, regardless of the motive underlying the breach.' As I understand that holding, proof of conduct which merely 'amounts to' a wilful tort without actually supporting an independent cause of action in tort will no longer suffice for recovery of punitive damages in a suit for breach of contract.

224 Va. at 711, 299 S.E.2d at 520 (Compton, J., dissenting).

The dissenting opinion then goes on to state:

> We are even advised by the majority that henceforth such a claim in tort should be pled in a count separate from that which alleges a breach of contract. This is a further indication, I submit, that no longer in Virginia will punitive damages be allowed in a pure contract action in which the proof shows conduct that evinces malice, wantonness or oppression.

*Id.*

■ Therefore, the court holds that it is proper to award punitive damages where there is an award of compensatory damages for breach of contract accompanied by proof of an independent, willful tort beyond the mere breach of a duty imposed by the contract. However, there is a standard of proof that must be met before punitive damages can be awarded in any case. The jury was instructed that, if it found a tort or torts, punitive damages could be awarded only if the Virginia standard for punitive damages had been met by the evidence.

Defendant relies upon language in the recent case of *Gasque v. Mooers Motor Car Co.,* 227 Va. 154, 313 S.E.2d 384 (1984). *Gasque* cites *Kamlar* as holding that "[p]unitive damages are unavailable in suits purely *Ex Contractu,* and can be awarded only where an independent, wilful tort is alleged and proved." *Gasque,* 227 Va. at 159, 313 S.E.2d at 388. That is a correct statement of *Kamlar* which is in accordance with the ruling of this court. However, defendant relies upon the following language to assert that compensatory

damages must be awarded for the tort before there can be an award of punitive damages:

> Even if the buyers' bill alleged a tort, which it fails to do, an award of compensatory damages, which are not claimed here, is an indispensible predicate for an award of punitive damages, except in actions for libel and slander.

*Gasque*, 227 Va. at 159, 313 S.E.2d at 388, *citing Newspaper Publishing Corp. v. Burke*, 216 Va. 800, 805, 224 S.E.2d 132, 136 (1976).

In *Gasque*, suit was brought for rescission of a contract. The prayer was for restoration of the parties to the *status quo ante*, including incidental damages. There was also a prayer for punitive damages, but the suit did not seek compensatory damages. The plaintiff, as the court pointed out, could have sought rescission of the contract and damages for the breach since the U.C.C. no longer requires an election of remedies between rescission and damages. The point, however, is that the plaintiff did not seek compensatory damages for breach of contract. The court simply said that compensatory damages must be awarded before punitive damages can be awarded. It did not say that the compensatory damages had to be for tort rather than for breach of contract. The defendant here is clearly attempting to read into *Kamlar* something which the majority did not say and which the minority did not interpret it to say.

## TORT OF CONVERSION

In *Buckeye National Bank v. Huff and Cook*, 114 Va. 1, 11, 75 S.E. 769, 772 (1912), the Virginia Supreme Court, quoting other authority with approval, defined conversion as "any wrongful exercise or assumption of authority, personally or by procurement, over another's goods, depriving him of their possession." Also, in *Universal C.I.T. Credit Corp. v. Kaplan*, 198 Va. 67, 76, 92 S.E.2d 359, 365 (1956), *citing* 19 *Michie's Jurisprudence*, Trover and Conversion, § 4 at 27, the Virginia Supreme Court stated:

> Any distinct act of dominion wrongfully exerted over the property of another, and in denial of his rights, or inconsistent therewith, may be treated as a conversion and it is not necessary that the wrongdoer apply the property to his own use. And when such conversion is proved, the plaintiff is entitled to recover, irrespective of good or bad faith, care or negligence, knowledge or ignorance.

Nationwide, in a written brief filed to support its motion for judgment n.o.v. or for a new trial, states that the only records of A & E which it obtained were certain original cancelled checks and bank statements for October and November, 1980. Nationwide contends that these were given to Mr. Willard, its independent contractor, and that no employee of Nationwide knew that he had these original records until May, 1984, after their return to A & E. Therefore, Nationwide argues that Mr. Willard, an accountant, had possession of the records and, accordingly, Nationwide could not be guilty of conversion.

This bald statement in Nationwide's brief simply is not correct. It is not in accord with the facts nor is it in accord with any interpretation of the facts. There is positive testimony that A & E turned over its cancelled checks to Nationwide after the fire. An aging sheet, by which representatives of A & E contacted customers to obtain invoices that had been mailed to the customers for sales made prior to the fire, was given to Nationwide. The testimony was that "we (A & E) were able to reconstruct $161,000" from the invoices. In response to a question about whether they forwarded the information to Nationwide, the answer, "Yes, sir, we did," was given. There was also positive evidence that Larry Fletcher's income tax returns were furnished to Nationwide and were held after return was demanded. Regarding accounts payable, witnesses testified that A & E turned its records over to Nationwide. This testimony was that "when we received these accounts payable invoices or, in other words, bills that we owed, uh, we went ahead and provided them to the insurance

company and, uh, we didn't have copies for ourselves."

Robert Lambert, A & E's bookkeeper, was called as a witness by Nationwide. Upon direct examination by Nationwide's counsel, Defendant's Exhibit 67 was introduced and Mr. Lambert was asked if he had submitted it to Mr. Willard. Mr. Lambert stated that he had. Exhibit 67 was identified by Mr. Lambert in the following manner: "This is the sales that we had left over from October. These were the invoices that customers brought in to us after the fire. It's not all. The rest of them that weren't priced were destroyed in the fire." Mr. Lambert was also asked to identify Exhibit 68 and he identified it as accounts receivable as of October 31, 1980. When asked whether he had provided it to Mr. Willard after the fire, his answer was, "Yes."

Terry Fletcher testified that Exhibit 2, the inventory taken prior to the fire, was turned over to Max Willard about twenty or thirty days after the fire. The evidence further discloses that after the records were forwarded to Willard a written demand was made to Nationwide by A & E to return the same. Correspondence was introduced from Nationwide's District Claims Manager, Robert Allen, advising A & E that "its records" would not be returned because to do so would be contrary to the best interests of Nationwide.

■ Conversion is the taking of personal property by one person and the repudiation by that person of the owner's rights, or the exercise of dominion over the property by that person in such a way as to be inconsistent with the rights of the owner. In this case, there is evidence, almost undisputed, in which the jury could have found that Nationwide exercised dominion over and refused to recognize the right of A & E to A & E's own records until compelled to do so by court order.

There was additional testimony which characterized the conversion of A & E's records by Nationwide as reckless disregard for the rights of another. Had there been a finding of no other tort than conversion, the verdict should be sustained in this case. There was testimony from Nationwide's own witnesses that a meeting took place between Mr. Willard, the independent accountant employed by Nationwide to assemble the records and testify as an expert witness, Mr. Robert Allen, the District Claims Manager, and Nationwide's attorney. At that meeting, Mr. Willard recorded in his notes that the purpose of the meeting was to come up with records and a theory to show that A & E had a motive for committing arson.

At trial, Mr. Willard, appearing as Nationwide's expert accountant, did not testify from his own computations but from arbitrary figures provided by Nationwide's agent and counsel. The figures they provided had no factual basis. Willard presented the figures to the jury to attempt to show that A & E was in bad financial shape, that the inventory was far less than the insurance coverage and that, in order to recoup its huge debt, A & E had deliberately set the fire. The jury obviously did not believe this testimony but believed the overwhelming testimony that the value of the property in the building far exceeded the insurance coverage.

■ The court concludes that Nationwide kept A & E's records to be able to prove its own side of the case and to prevent A & E from proving its side. Since Nationwide had the records, A & E could not provide necessary materials to enable their own expert witness to disprove Nationwide's theories. This was not only bad motive on the part of Nationwide but also willful and wanton conduct which alone was sufficient to support an award of punitive damages.

### FRAUD

In accordance with Virginia Law, the jury was charged that the burden of proof was on the plaintiff to prove fraud by clear and convincing evidence. *Mutual of Omaha Insurance Co. v. Dingus*, 219 Va. 706, 250 S.E.2d 352 (1979). The jury was further instructed that actual fraud is the

intentional misrepresentation of a material fact with the intent to mislead another person and reliance by that person so that damage results. *Packard Norfolk, Inc. v. Miller*, 198 Va. 557, 95 S.E.2d 207 (1956). A misrepresentation was defined as an incorrect statement of an actual existing or past fact; a promise, an expectation or an opinion concerning the future is not a misrepresentation. The jury was instructed that a misrepresentation may result from silence or from suppression of facts. *Horner v. Ahern*, 207 Va. 860, 153 S.E.2d 216 (1967). The jury was further instructed that Nationwide had violated the Arson Reporting Immunity Act by failing to notify an authorized agency in writing of the material which suggested arson, developed in the course of Nationwide's investigation of the fire loss, and that if Nationwide, by suppression of facts, had made a material misrepresentation upon which A & E had relied to its detriment, then the jury could find Nationwide guilty of fraud. In a second interrogatory, the jury found that the defendant had committed fraud.

The court has carefully reviewed the evidence and finds that the plaintiff failed to prove fraud by clear and convincing evidence. The testimony of the two individuals who owned A & E Supply Company was particularly examined. Terry Fletcher testified that he was informed in the middle of November that the insurance company thought that the owners of the property had committed arson. (Tr. I at 97). He stated that, until then, there had been no indication of any problem about payment of the claim and that he would not have given the records to Nationwide if he had known Nationwide was contending that he had committed arson. Fletcher stated that A & E had discharged no employees and had informed its creditors that they could expect to be paid. He further testified that Mr. Allen, a representative of Nationwide was there within a couple of days after the fire.

The testimony of Larry Fletcher was somewhat more detailed on this point than that of his brother. His testimony on direct examination is as follows:

Q. Okay. What did the insurance company tell you the situation was going to be right after the fire?

A. Uh, they were going to help us, and,

Q. Who told you that?

A. Mr. Robert Allen.

Q. What did he tell you?

A. Uh, I told him right after he came, just immediately after the fire, about the last day that he was there, I guess, that we needed some immediate financial assistance, 'cause we didn't have any income, and that my creditors were really getting uneasy. And, I asked him if there was anyway tht they could go ahead and even give us partial coverage right now, give us partial money to help us to stay on a plea, and he said, 'I think we can help you.' And, I said, 'Well, within the next week, or two weeks, or when?' And, he said, 'Possibly.' And, I said, 'would it be okay if I go ahead and contact my creditors, that we would have some income coming in in the next couple of weeks?' And, he said, 'Yes.' And, I did, I stuck my neck out with my creditors and I told them that, and it didn't happen.

Q. Well now, it was only the 27th that the fire occurred, and you said that on the 30th or thereabouts, you were already telling him that the creditors were uneasy. Were you having that much trouble with your creditors?

A. No, sir.

Q. Well, why three days after the fire were you already trying to get money to take care of your creditors?

A. Well, naturally they knew that our business was totally destroyed, and they were wondering what my situation was, and I told them, you know, that I felt that we had, you know, the proper coverage, and we would be going again here, pretty soon. And, that we'd be back, you know, strong.

Q. Did you plan on going back in strong?

A. Oh, yes, sir.

Q. Did you fire any employees?

A. No, sir.

Q. Now, the insurance company didn't pay you anything. When did you find out, or what was the first indication you had, the insurance company wasn't going to help you continue?

A. Well, after I had contacted my creditors and told them, you know, that I felt like that we could have some money here within the next couple—I told them exactly what Mr. Allen said. And then I think it was into the second week after, I asked him in a week or two, I think I called Mr. Allen, I did call him, and asked him if, you know, if our claim, are we still going to be able to get some of the money. And, he said, 'No.'

Q. Did he explain to you, why?

A. No, sir. He just said, 'Things is under investigation.'

(Tr. I at 296–98).

The words of Mr. Allen were couched in the framework of "I think we can help you" or "possibly." Clearly, Mr. Allen stated no more than an expectation or opinion concerning payment in the future. His statement must be taken in context; if considered a promise, it was made during the first two weeks after the fire, while the fire was still under investigation. The insurance company could not have reasonably been expected to arrive at a final answer in that short period of time. Furthermore, A & E had a duty under its insurance contract to provide any records that it had following a fire loss. A & E therefore cannot claim that it submitted records in reliance upon some promise made by Nationwide.

■ This evidence of fraud is not solid evidence of the type required when the standard of proof is "clear and convincing." The court has reviewed the record and failed to find any evidence showing detrimental reliance by A & E upon Nationwide's failure to comply with the Arson Reporting Immunity Act. No such evidence has been indicated by A & E's counsel. While the violation of the Arson Reporting Immunity Act is evidence of the bad faith of Nationwide, it is insufficient to constitute fraud.

## BAD FAITH

As recently as 1983, this court in an opinion by Judge Turk found no Virginia authority which either rejects or accepts a cause of action in tort for bad faith failure to pay insurance benefits. *Morgan v. American Family Life Assurance Co. of Columbus*, 559 F.Supp. 477, 482 (W.D.Va. 1983). Judge Turk concluded his study of the subject as follows:

> This court does not hold at this time that the Supreme Court of Virginia would recognize a cause of action in tort for bad faith failure to settle a first party insurance claim. Nevertheless, a court should be especially reluctant to dismiss a complaint that asserts a novel theory of liability.

*Morgan*, 559 F.Supp. at 483, *citing* 5 C. Wright and A. Miller, *Federal Practice and Procedure: Civil* § 1357 at 603 (1969).

Following the precedent of not dismissing a claim which alleges the tort of bad faith, particularly in view of the fact that Judge Turk wrote without benefit of the decision of the Supreme Court of Virginia in *Kalmar,* this court submitted to the jury the issue of whether Nationwide had acted in bad faith by not settling A & E's claim. The jury found that Nationwide had acted in bad faith and allowed $500,000 in punitive damages. Accordingly, the court must now determine whether Virginia recognizes the tort of bad faith failure to settle an insurance claim.

An analysis of the *Morgan* opinion reveals that Judge Turk strongly states that the tort of bad faith failure to pay an insured's claim exists in Virginia. He presents four reasons why the Virginia Supreme Court would recognize a cause of action in tort for bad faith failure to settle a first party insurance claim. The first is that many state courts throughout the country have held that the tort of bad faith arises from the implied duty of an insurer to deal fairly and to act in good faith in processing claims. Judge Turk cites case

law from Indiana, Connecticut, South Carolina, Vermont, Oklahoma, Rhode Island and Wisconsin. *Morgan,* 559 F.Supp. at 482. This court finds it unnecessary to repeat the citations, except for those cases particularly analogous to the question presented here. In addition, the Alabama Supreme Court has recognized the tort of bad faith in first party actions where it can be proven that the insurer lacks a reasonable basis for denying the claim or intentionally fails to determine whether there is a lawful basis of denial. *Chavers v. National Security Fire and Casualty Co.,* 405 So.2d 1 (Ala.1981).[2]

The second reason asserted by Judge Turk is his interpretation of *Aetna Casualty and Surety Co. v. Price,* 206 Va. 749, 146 S.E.2d 220 (1966). The specific factual issue presented to the Supreme Court of Virginia there involved the insured's bad faith refusal to settle a third party claim against the insured for an amount within the insurance coverage. *Id.* The court stated that "A relationship of confidence and trust is created between the insurer and the insured which imposes upon the insurer the duty to deal fairly with the insured in the handling and disposition of any claim covered by the policy." 206 Va. 749 at 760–61, 46 S.E.2d 220 at 227–28 (citations omitted). Thus the Virginia Supreme Court has imposed a duty on a liability insurer to exercise good faith in the settlement of third party claims against its insured because of the special fiduciary relationship between the insured and the insurer. The same "rationale which imposes a duty on the insurance company to exercise good faith in the negotiation and settlement of third party claims is of equal but separate importance when an insured seeks payment of legitimate claims from his own insurance carrier." *Trimper v. Nationwide Insurance Co.,* 540 F.Supp. 1188, 1193 (D.S.C.1982).

The third indication that the tort of bad faith exists is found in Restatement (Second) of Contracts § 205 (1981). The Restatement recognizes that every contract imposes a duty of good faith and fair dealing in its performance and enforcement, whether it is an insurance contract or any other type. *Morgan,* 559 F.Supp. at 483. The fourth reason that Virginia would recognize the special relationship between an insurance company and its insureds is the legislative enactment of a broad range of statutory controls over insurance companies. *See generally* Title 38.1, Code of Virginia. Virginia Code § 38.1–32.1 (1984 Supp.) provides that an insurer's bad faith denial of coverage entitles the insured to recover costs and attorney's fees arising from a civil case. In addition, the Code imposes the duty of good faith on insurers for prompt and equitable settlements of claims in which liability has become reasonably clear. Va.Code § 38.1–52.9(6) (1981 Repl.Vol.). The enactment in other states of laws such as Virginia has promulgated has influenced those courts to recognize first party actions for bad faith in handling insurance claims. *Christian v. American Home Assurance Co.,* 577 P.2d 899 (Okla. 1978); *Phillips v. Aetna Life Insurance Co.,* 473 F.Supp. 984 (D.Vt.1979); *Trimper v. Nationwide,* 540 F.Supp. 1188 (D.S.C. 1982).

The Virginia General Assembly has enacted a statute which provides that the tort of bad faith failure to pay a motor vehicle insurance claim of less than $500.00 justifies an award of double damages. Va.Code

---

**2.** Other states which recognize the tort of bad faith failure to settle a first party insurance claim, arising from the implied duty of an insurer to deal fairly and act in good faith, include California, *Gruenberg v. Aetna Casualty and Surety Co.,* 9 Cal.3d 566, 108 Cal.Rptr. 480, 510 P.2d 1032 (1973), Florida, *Escambia Treating Co. v. Aetna Casualty & Surety Co.,* 421 F.Supp. 1367 (N.D.Fla.1976), Illinois, *Roberts v. Western-Southern Life Insurance Co.,* 568 F.Supp. 536, 554–55 (N.D.Ill.1983), Mississippi, *O'Malley v.*

*United States Fidelity and Guaranty Co.,* 602 F.Supp. 56 (S.D.Miss.1985) and Missouri, *Associated Photographers, Inc. v. Aetna Casualty & Surety Co.,* 677 F.2d 1251 (8th Cir.1982).

Some states have codified the tort cause of action. These include Georgia at Georgia Code Annotated § 56–1206, Montana at Montana Code Annotated § 27–1–221 (1979) and Tennessee at Tennessee Code Annotated § 56–1105a (1980 Repl.).

§ 8.01–66.1 (1984 Repl.Vol.) In such cases, the judge decides whether to award double damages because cases involving less than $500.00 are usually brought in general district court and are not tried by a jury. The prohibition against acts of bad faith applies to claims between the insured and the insurer and to third party claims. *Id.* The double recovery is available upon a finding of bad faith. It is awarded as compensatory damages, not as punitive damages. In order to recover punitive damages, there must also be a finding of willful and wanton misconduct by the insurer. The important question here is whether Virginia recognizes the tort of bad faith failure to settle an insurance claim. The tort is implicit in the statutory scheme as well as having been recognized in the case law.

Some courts have interpreted statutes which impose penalties and attorney's fees on the insurance companies to show legislative intent to exclude a common law remedy for bad faith conduct. *Morgan,* 559 F.Supp. at 483, *citing Spencer v. Aetna Life and Casualty Insurance Co.,* 227 Kan. 914, 611 P.2d 149 (1980) and *Farris v. United States Fidelity and Guaranty Co.,* 284 Ore. 453, 587 P.2d 1015 (1978). However, the overwhelming majority of courts in the United States which have considered statutory schemes penalizing bad faith and which recognize third party claims for bad faith refusal to settle below policy limits have recognized an implied duty of the insurer to deal fairly and act in good faith in processing claims.

■ A minority of the courts in the United States recognizes the duty to deal fairly with a third party claimant but holds that the relationship of confidence and trust which creates that duty does not exist between an insurer and its insured. *Id.* at 482. The Virginia Supreme Court, however, is clearly not a member of that minority, having specifically stated that the duty to deal fairly exists in Virginia in "the handling ·and disposition of any claim." *Price,* 206 Va. at 761, 146 S.E.2d 220. The rule expressed in *Price* is in accord with Restatement (Second) of Contracts § 205 (1981) which requires good faith and fair dealing in every contractual situation. The Virginia Supreme Court recognizes a fiduciary relationship and requires good faith and fair dealing even in cases involving joint ventures, where there is no specific contractual relationship between the parties. *Witter v. Torbett,* 604 F.Supp. 298 (W.D.Va.1984). Finally, Virginia's statutory scheme, which awards double damages plus attorney's fees in bad faith cases and double damages in other insurance cases supports recognition of the tort of bad faith more strongly than·do the statutory schemes of most jurisdictions. For these reasons, Virginia would follow the majority rule and recognize the tort of bad faith failure to settle a claim in first party actions.

■ If there has ever been a case in which the facts justify a finding of bad faith by an insurance company adjusting a fire loss, this is the case. The evidence is almost undisputed that Nationwide acted in bad faith in handling A & E's claim. The following badges of bad faith are present in this case: (1) While Nationwide interviewed numerous witnesses including policemen, firemen and reputable citizens, it chose to completely ignore what those witnesses told its agents about the origin and location of the fire, relying instead upon one witness who viewed the fire from a very poor vantage point. (2) Undisputed evidence showed that the roof collapsed, covering most of the floor area over which the fire burned and that debris covered the floor in all the other areas. Yet Nationwide's investigators went to the scene, uncovered a small area of the floor and, due to some spaulding, designated the uncovered area as the point of origin. (3) Nationwide made no effort to determine whether a short circuit or other electrical problem caused the fire even though one piece of circumstantial evidence, a clock on the exterior wall, strongly suggested an electrical cause. The clock had stopped at fifteen minutes after nine P.M. The fire was not discovered until about midnight, which might indicate that it had smoldered

a long time, as opposed to Nationwide's theory of a sudden blaze which was deliberately set using gasoline. (4) Nationwide refused to accept the inventory which had been substantially completed for A & E's fiscal year ending November 1. Instead, Nationwide conducted its own inventory, counting those items which were visible and ignoring those which were covered or which had been completely destroyed. (5) Nationwide knew within days that its investigators would claim that arson was involved but never complied with Virginia Law which requires the reporting of suspected arson. Nationwide was attempting to construct a scenario in which they would have their evidence, but A & E would be unable to obtain any evidence of its own. The failure to report suspected arson prevented any government agency from making an investigation to determine whether arson had been committed. This violation of law was committed to gain an evidentiary advantage. That is the most plausible reason for having ignored the reporting statute, since Nationwide admitted that it was familiar with the law. (6) Shortly after the fire, Nationwide began to tell A & E's creditors that arson had been committed. This was done to destroy the credibility of A & E so that A & E could not go back into business. It was a tremendous act of bad faith intended to create a settlement advantage for Nationwide. The evidence of arson when Nationwide began to inform A & E's creditors was marginal at best. Even if the evidence had been substantial, Nationwide acted improperly in telling creditors who could have helped A & E get back into business that the fire was of suspicious origin. (7) The offer made by Nationwide five or six months after the fire was calculated to be the amount that A & E could hope to obtain if awarded a verdict for everything that they claimed. Undisputed testimony showed that the normal costs of a lawyer, excluding any costs for expert witnesses and investigation that would be involved, subtracted from the maximum amount recoverable under the policy, would be approximately the amount that Nationwide was willing to offer A & E

to settle the case. (8) Nationwide hired an accountant for the sole purpose of fabricating and substantiating at trial a theory to explain why A & E might burn its own building. In other words, Nationwide hired a supposedly independent accountant, furnished him with figures known to be inaccurate and required him to use those figures, which had no factual basis. At trial, the accountant admitted that the figures had been furnished by Nationwide and that he could not justify or swear to the accuracy of any of them. (9) Nationwide eventually paid Borg-Warner Acceptance Corporation based upn A & E's inventory, yet refused to use the same inventory to settle with A & E. (10) Nationwide's actions fell short of fraud. Nevertheless, Nationwide led A & E astray by words which could have been taken as encouragement, causing A & E to believe that a settlement would be forthcoming. Nationwide thus prevented A & E from adequately preparing for trial during the crucial time when an investigation could have been conducted more accurately and made it far more difficult for A & E to present its case. (11) While accusing the principal owners of arson, Nationwide made no effort to investigate their whereabouts at the time of the fire so as to either confirm or refute their statements. (12) By delaying payments to Borg-Warner Acceptance Corporation and Cumberland Bank and Trust Company for seven and nine months, respectively, and by delaying payment to A & E, Nationwide created an unfair incentive for A & E to settle for a sum significantly smaller than that due under the policy. (13) The fact that Nationwide waited until after the trial to admit that the building had greater fair market value than the amount of coverage was an extreme act of bad faith. (14) Nationwide cancelled A & E's policy after the fire. Cancellation was designed to position A & E so that it needed to settle in order to resolve the insurance problem. A & E was also placed in a difficult position to begin a new business. This placed A & E at a further disadvantage in settlement negotiations.

## IS THERE AN IMPLIED PRIVATE RIGHT OF ACTION UNDER THE VIRGINIA UNFAIR TRADE PRACTICES ACT?

Virginia Code § 38.1–49 *et seq.* (1981 Repl. Vol.) prohibits numerous insurance practices. It is regulatory in nature and empowers the State Corporation Commission to investigate and impose sanctions on persons who commit the prohibited practices. The sanctions include cease and desist orders, monetary penalties and revocation or suspension of licenses. The Virginia statute is based on a model act proposed by the National Association of Insurance Commissioners which has been adopted by at least 45 states. *Insurers and Third Party Claimants: The Limits of Duty,* 48 U.Chi.L.Rev. 125, 146 N. 75 (1981).

A & E's amended complaint alleges in Count VI that "[d]efendant was guilty of unfair trade practices and damaged plaintiff." Incorporated into Count VI are 26 previous paragraphs each alleging a factual basis for A & E's claim of unfair trade practices. This court held that a violation of the Unfair Trade Practices Act (Act) constituted a tort giving rise to a private cause of action. An interrogatory asked the jury to decide whether Nationwide had violated the Act, the answer was, "Yes." In instructing the jury, the court listed six practices prohibited by the Act and charged the jury that if any of those acts were committed by Nationwide with actual malice or with a willful and wanton disregard

of plaintiff's rights then punitive damages could be awarded.[3]

■ This court is bound by the precedent set in *Morgan v. American Family Life Assurance Co. of Columbus,* 559 F.Supp. 477 (W.D.Va.1983), which stated, "Therefore, the court holds that the Supreme Court of Virginia would follow the reasoning in *Jenkins* and judicially imply a private cause of action in favor of insureds from the Virginia Unfair Trade Practices Act." *Id.* at 485.

This court believes that *Morgan* correctly applied the four-prong test for an implied private remedy set forth in *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975). *Cort v. Ash* was subsequently strengthened by the language in *Cannon v. University of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1978), when the Court stated that it "Has never withheld a private remedy where the statute explicitly confers a benefit on a class of persons and where it [the statute] does not assure those persons the ability to activate and participate in the administrative process contemplated by the statute." *Id.* at 707 n. 41, 99 S.Ct. at 1963 n. 41.

*Morgan* relies heavily on an interpretation of the West Virginia statute prohibiting unfair insurance practices, which is very similar to Virginia's Unfair Trade Practices Act. 559 F.Supp. at 484, *citing Jenkins v. J.C. Penney Casualty Insurance Co.,* 280 S.E.2d 252 (W.Va.1981). For

---

**3.** You're further instructed that no person or corporation engaged in the business of insurance shall commit any of the following: (1) refusing arbitrarily and unreasonably to pay a claim; (2) not attempting in good faith to affectuate prompt, fair and equitable settlements of claims in which liability has become clear; (3) compelling the insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amount ultimately recovered in the action brought by such insured; (4) delaying the investigation or payment of claims by requiring an insured, claimant or the physician of either to submit a preliminary claim report and then requiring the subsequent submission of formal proof of loss forms both of which submissions contain substantially the same information; (5) failing to

settle promptly claims where liability has become reasonably clear under one portion of the insurance policy coverage in order to influence settlement under other portions of the insurance policy coverage and (6) failing to provide promptly a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement. If you believe from the evidence that the defendant committed any of the foregoing acts and in doing so acted with actual malice toward the plaintiff or acted under circumstances amounting to a willful and wanton disregard of the plaintiff's rights, then you will award punitive damages in accordance with the other instructions of the Court.

example, the West Virginia statute provides that administrative orders "shall [not] in any manner relieve or absolve any person affected by such order ... from any other liability." W.Va.Code 33–11–6(c) (1982 Repl.Vol.). The Virginia statute states that "[n]o order of the Commission under this article shall in any way relieve or absolve any person affected by such order from any liability under any laws of this Commonwealth." Va.Code § 38.1–57.1 (1981 Repl.Vol.).

While this court is bound and follows the *Morgan* holding, procedural problems remain. In *Jenkins,* the West Virginia court held that the underlying claim of the insured or third party against the insurer must be resolved before litigating the unfair practices claim. 280 S.E.2d at 259. The court stated that "[o]nce the underlying claim has been resolved, the issues of liability and damages have become settled and it is possible to view the statutory claim in light of the final result of the underlying action." *Id.* The California Supreme Court, for different reasons, mandates the same procedure. *Royal Globe Insurance Co. v. Superior Court,* 23 Cal.3d 880, 153 Cal.Rptr. 842, 592 P.2d 329 (1979). Virginia, however, allows contract and tort actions to be brought in one action. Va.Code § 8.01–272 (1984 Repl.Vol.). The manner of pleading is mandated by *Kamlar,* 224 Va. at 707, 299 S.E.2d at 518. The procedure used by A & E was proper. The Unfair Trade Practices Act implies a private right of action sounding in tort which can be tried along with the contract action for punitive damage purposes.

West Virginia also holds that more than a single violation must be proven in order to support any recovery. *Jenkins,* 280 S.E.2d at 259–60. The initial words of Section 33–11–4(9) provide that "no person shall commit or perform *with such frequency* as to indicate a general business practice any of the following ...." W.Va. Code § 33–11–4(9) (1982 Repl.Vol.) (emphasis added). For this reason, the West Virginia court concluded that multiple violations occurring in the same claim or proof of breaches in several other claims would support a private action. *Id.* at 260.

In Virginia, certain single acts may support a cause of action under the Unfair Trade Practices Act while other acts must occur frequently. Section 38.1–51 states that "[n]o person shall engage in this state in *any* trade practice which is defined in §§ 38.1–52.1 through 38.1–52.14 of the Code of Virginia as an unfair method of competition or an unfair or deceptive act or practice in the business of insurance." Va. Code § 38.1–51 (1981 Repl.Vol.) (emphasis added). False advertising, defamation, boycotts, intimidation, discrimination and rebates are examples of single act violations for which a person may be liable. However, Section 38.1–52.9 contains the following language which is almost identical to the West Virginia statute: "No person shall commit or perform *with such frequency* as to indicate a general business practice any of the following ...." Va. Code § 38.1–52.9 (1981 Repl.Vol.) (emphasis added). In order to be consistent in following *Jenkins,* since the language used in the jury charge was taken from Va.Code § 38.1–52.9 (*see* Endnote 2), this court should have admitted evidence of frequency and instructed the jury accordingly. Nationwide objected when A & E offered evidence of other unfair practices of Nationwide; the objection was sustained. Nationwide also objected to the jury instruction given (*see* Endnote 3). While those objections were somewhat inconsistent, the court now believes that it erred in not permitting evidence of other unfair practices.

■ Having found, based upon the proof of Nationwide's conversion and bad faith, that the jury award of compensatory and punitive damages was proper, the court considers the finding of violation of the Unfair Trade Practices Act to have been harmless error. Should a higher court find the other opinion in this case to be erroneous, this court would grant a new trial on the unfair trade practices claim.

## SHOULD A & E RECOVER ITS COSTS AND REASONABLE FEES OF ITS ATTORNEYS BASED ON VIRGINIA CODE § 38.1–32.1?

On September 13, 1984, A & E petitioned the court to award its costs and attorney's fees. The ground proposed was Virginia Code § 38.1–32.1,[4] which grants a trial judge discretion to award costs and attorney's fees to an insured who proves at trial that his insurer "has not in good faith either denied coverage or failed or refused to make payment to the insured...." Va. Code § 38.1–32.1. (Supp.1984). Nationwide's answer included two broad arguments to support its position that the petition should be denied: (1) the statute is inapplicable to A & E and (2) the petition itself was not proper.

The court treats A & E's petition as a motion for relief from the final judgment and order entered on June 12, 1984. Fed. R.Civ.P. 60. Rule 60(b)(6) provides that on motion of a party and upon such terms as are just, a court may relieve a party "for any other reason justifying relief ...." *Id.* The rule provides that the motion must be made "within a reasonable time." *Id.* Because A & E's motion was timely filed the court will now consider its merits.

Nationwide proposes four arguments to show that Virginia Code § 38.1–32.1 is not applicable to A & E; only two are meritorious. The first is that A & E may not avail itself of the benefits of the statute because the statute, by its own terms, does not apply to corporations. Nationwide also contends that the statute does not apply retroactively.

The statute by its express terms applies to an "insured individual." Nationwide argues that a corporation is not within the

definitional scope of an "insured individual." A & E urges that "individual" is interchangeable with "person." The correct definition of person, A & E contends, would include both natural and artificial persons and, therefore, corporations.

Title 38.1 of the Virginia Code contains all legislation concerning the insurance business in Virginia. Va.Code Title 38.1 (1950). Section 38.1–1 states definitions which are used throughout the title. No definition of "individual" appears. However, in the definitions given for "company" and "person", the words "individual" and "corporation" are included as part of the operative definitions. Va.Code §§ 38.-1–1(4) and (11) (1981 Repl.Vol.). Nationwide cites *Jones v. Conwell*, 227 Va. 176, 314 S.E.2d 61 (1984) for the proposition that the words "individual" and "corporation" are both included because they have separate distinct meanings. The Virginia Supreme Court said in *Conwell:*

> The rules of statutory interpretation argue against reading any legislative enactment in a manner that will make a portion of it useless, repetitious or absurd. On the contrary, it is well established that every act of the legislature should be read so as to give reasonable effect to every word ....

*Id.* at 181, 314 S.E.2d at 64.

The court has examined other chapters within Title 38.1 and concludes that the legislature has intended the words "individual" and "corporation" to have separate distinct meanings. Section 38.1–52.14, which was repealed effective January 1, 1982, defined "[i]ndividual" as "any natural person who is a past, present or proposed named or principal insured...." *Va.Code* § 38.1–52.14(3) (1981 Repl.Vol.). Section

---

**4.** § 38.1–32.2. Award of insured's attorney fees in certain cases.—Notwithstanding any provision of law to the contrary, in any civil case in which an insured individual sues his insurer or his self-insurer to determine what coverage, if any, exists under his present policy or the extent to which his insurer is liable for compensating a covered loss, such individual insured shall be entitled to recover from the insurer costs and such reasonable attorney fees as the trial judge

after verdict may award if it is determined by such trial judge in such case that the insurer has not in good faith either denied coverage or failed to refused to make payment to the insured under such policy.

Nothing in this section shall be deemed to grant a right to bring an action against such insurance companies by an insured who would otherwise lack standing to bring action. (1982, c. 576.)

38.1–57.5 defines terms used in Article 6.1, the Insurance Information and Privacy Protection Act. Va.Code § 38.1–57.5 (1981 Repl.Vol.). "Individual" is defined there as "any natural person ...." *Id.* The weight to be accorded these definitions is diminished because both are limited in application to their respective sections and because Section 38.1–52.14 has been repealed. However, they serve as significant indicia of the legislature's intent to distinguish between individuals and corporations. In addition, a section within the same article as the cost and fees provision states, "No individual, partnership, corporation or association ...." *Va.Code* § 38.1–31.3 (1981 Repl.Vol.). That section clearly evidences an intent to encompass both individuals and corporations. Applying the *Conwell* reasoning, were individual and corporation read as synonymous, the legislature would necessarily have crafted a statute which is redundant. 227 Va. at 181, 314 S.E.2d at 64.

The legislature clearly intended to benefit natural persons when it used the language "insured individual." Va.Code § 38.1–32.1 (1981 Repl.Vol.). A & E argues that to limit the statute to natural persons is to discriminate unjustly and without reason against corporations. However, as Nationwide contends, it appears that the legislature enacted the statute as a form of consumer protection. Its purpose is to reimburse individual policy holders who, because of bad faith, are forced to sue their insurers to collect. Obviously, the legislature did not feel that corporations needed such protection.

■ The court finds that "individual" as used in Virginia Code § 38.1–32.1 includes only natural persons. *Id.* A & E, being a corporation, is therefore outside the coverage of the statute.

## CONCLUSION

An Order will accordingly be entered denying defendant's motions for judgment n.o.v. and for new trial, entering final judgment on the verdict of the jury for the plaintiff, and denying plaintiff's petition for attorney's fees.