Renee J. SAUNDERS and Housing Opportunities Made Equal, Plaintiffs,

v.

GENERAL SERVICES CORPORATION and Jonathan Perel, Defendants.

Civ. A. No. 86–0229–R.

United States District Court, E.D. Virginia, Richmond Division.

May 12, 1987.

Timothy M. Kaine, Little, Parsley & Cluverius, P.C., Richmond, Va., William H. Jeffress, Jr., Rory K. Little, Miller, Cassidy, Larroca & Lewin, Washington, D.C., Kerry A. Scanlon, Washington Lawyers' Committee for Civil Rights Under Law, Washington, D.C., for plaintiffs.

James Patrick McElligott, Jr., Richmond, Va., and Scott S. Cairns, McGuire, Woods, Battle & Boothe, for defendants.

## MEMORANDUM

MERHIGE, District Judge.

This cause, which has been tried and the issues briefed, is now ripe for disposition.

*The Parties*

Renee Saunders, a black female who resides in Richmond, Virginia, is an individual plaintiff in the instant action. Plaintiff Housing Opportunities Made Equal ("HOME") is a non-profit corporation organized under Virginia law and supported by private contributions, grants, and contracts with the City of Richmond. Its purposes are to further the goals of the Fair Housing Act and to promote equal housing opportunities in the Richmond area.

Defendant General Services Corporation ("GSC") is a Virginia corporation which operates and manages fourteen apartment complexes in the Richmond area. Defendant Jonathan Perel, a white male, is President of GSC and has a financial interest in each of the entities owning the complexes managed by GSC.

*Background*

The claims in the instant action fall into two basic categories and groups of facts. First, plaintiff HOME claims violations concerning a 1983 conciliation agreement en-

tered into between HOME and GSC. HOME essentially alleges that the defendants committed fraud which induced HOME to sign the contract, and that they have breached various advertising provisions contained in the agreement. Second, both plaintiffs claim that certain of defendants' advertising practices violate the Fair Housing Act, 42 U.S.C. § 3601 *et seq.* and the Civil Rights Act of 1866, 42 U.S.C. §§ 1981, 1982.

*Facts*

Based on the evidence produced at trial, the Court finds the facts as summarized below and as discussed at various times in this memorandum when applying the law. In 1981, HOME, along with several individual complainants, including two former GSC employees, filed administrative complaints with the Virginia Real Estate Commission ("VREC") and the U.S. Department of Housing and Urban Development ("HUD"). They alleged that GSC, through its supervisory employees, had committed various acts of housing discrimination aimed at discouraging or preventing blacks from renting housing in GSC apartment complexes. Many of such allegations focused on the conduct of a GSC Property Manager, John Hunt.

The Court heard and credits the testimony of both Lynn Graybill and Jean Mann, complainants in the 1981 action, concerning the events that formed the basis of the 1981 complaints. While the subject matter of such complaints is not a part of the instant action, their testimony provides relevant background information concerning GSC's attitude toward fair housing and the credibility of Mr. Hunt's testimony.

Both Graybill and Mann testified that Hunt instructed them on various occasions to treat black tenants and prospective tenants less favorably than whites, including discouraging GSC-sponsored social activities that might attract black tenants and "turning off the charm" to prospective black tenants. Mann also testified that defendant Perel was present at meetings at which Hunt recommended such action and did not express any disagreement. Further, she informed Perel of her concerns

about Hunt's discriminatory actions after she was terminated by GSC, but he took no action once Hunt disclaimed her allegations.

After VREC conducted its investigation and issued reasonable cause determinations as to Graybill's and Mann's complaints, Dr. Barbara Wurtzel, HOME's Executive Director in 1982–83, and the Assistant Director, Linda Harms, made the decision to attempt conciliation of its complaints with GSC.

The evidence establishes that HOME considered negotiation of affirmative advertising provisions, in conformity with HUD regulations, to constitute a crucial element of its conciliation agreement with GSC, as with all such cases. As such, a standard provision in all of its proposed agreements required that all advertising and other printed materials contain an equal housing opportunity slogan or logo within thirty days of the effective date of the conciliation agreement. Such provision was proposed by HOME to GSC as part of its proposed agreement submitted to GSC's attorneys on August 30, 1982.

In reaction to HOME's proposal, GSC's attorney submitted a letter to HOME's attorney dated October 12, 1982, which outlined its concerns with the proposed agreement in order to facilitate the parties' next negotiating meeting. Concerning the affirmative advertising provisions, the letter represented that:

GSC will undertake some affirmative action in advertising so long as the agreement recognizes economic reality. Although classified newspaper advertising is relatively easy to change, advertising that involves layout by professional advertisers can only be changed at considerable expense. In addition, advertising other than through newspapers is printed in bulk and used over a period of time. Any changes in such advertising could not be adopted until the current store of materials has been distributed.

Both Linda Harms and Dr. Wurtzel testified that they were concerned by GSC's reaction to the 30–day provision because the affirmative advertising provisions were

a major component of the agreement and a 30–day limit was customary in such agreements. Based on this concern, both Harms and Wurtzel recalled asking defendants' counsel in a negotiating session the extent of GSC's "current store of materials" because they believed allowing depletion of the current supply would be acceptable only so long as such supply was not extensive and compliance would be achieved in a reasonably short time. Both witnesses remember counsel representing to them that the supply was not large and would be depleted in a matter of months, and less than a year. · Wurtzel's testimony, to which the Court gives credence, is somewhat more exact, with her recollection that such representation occurred in approximately March 1983 and was that GSC had approximately a two-month supply. While counsel's representation may have been premised on an honest belief at the time, subsequent conduct of the defendants supports the Court's conclusion that they acted in an unlawful manner. Ms. Harms further testified that Marianne Phillips, GSC Operations Manager at that time, confirmed that GSC's supply was not extensive.

Both Harms and Wurtzel testified that such representation was crucial to their acceptance of GSC's modification to the agreement, providing that a slogan or logo would be included in GSC's advertising materials, other than newspapers, "when those materials are reprinted."

The only rebuttal evidence offered by defendants concerning such representation was Marianne Phillips' statement that she didn't recall whether she had represented that GSC's current supply was small.

While the agreement was finally executed between July 13 and 18, 1983, the testimony indicates that, as one would expect in contract negotiations, individual provisions within the agreement were agreed upon at various points in late 1982 to mid–1983. Both Harms and Wurtzel testified that agreement on the affirmative advertising provisions was reached early in the negotiating process. Dr. Wurtzel testified that such agreement was reached in approximately March 1983, and that after

that date, the remaining negotiations focused on confidentiality and content of the news release. Her recollection is reinforced by her negotiating notes of March 2 and 9, 1983.

While defendants argue generally that there was no legal agreement at all until the final agreement was signed in July 1983, they offer no evidence contradicting plaintiff's evidence that the advertising provisions had been agreed upon by the parties by March 1983.

HOME's attorney sent copies of the final conciliation agreement agreed to by HOME and GSC to VREC and HUD on June 20, 1983. This agreement was executed by VREC, HOME, the individual complainants, GSC, Perel, Hunt, and Betsy King, GSC's marketing director, between July 13 and 18, 1983, and became effective on July 18, 1983.

It included affirmative advertising provisions by which GSC agreed to include an EHO slogan or logo in all future newspaper advertising and "in other future printed advertising materials when those materials are reprinted." Such affirmative advertising provisions were to remain in effect for two years.

As part of the agreement, HOME released GSC and Perel from all claims which it had ever had against them up until the date of the agreement, including claims for violations of the Fair Housing Act and 42 U.S.C. §§ 1981–82.

HOME subsequently discovered, in approximately April 1985, that GSC had ordered 134,000 copies of its *Lifestyle* brochure without any EHO logo or slogan on approximately June 15, 1983—just days before signing the conciliation agreement. Such order went to press beginning on June 19, 1983, and was completed by July 23, 1983. Doug Ziegler, owner of the advertising agency which GSC uses, testified that he submitted a formal purchase order for 134,000 copies of *Lifestyle* on June 30, 1983, that he would have discussed price quotations and quantity of the order with GSC prior to that date, and that it would have taken approximately three weeks to print the order although he did not know

the exact date on which printing was begun or completed.

Marianne Phillips testified that on June 1983 she ordered 134,000 copies of *Lifestyle*, which she believed would last for approximately one year. In fact, such supply lasted far past the term of the conciliation agreement because, Phillips testified, GSC decided not to proceed with a planned mass mailing in April 1984. According to Phillips' testimony, the large order was placed due to the cheaper unit cost, although she had testified at her deposition that she had no recollection of why such a large order was placed.

At no time during this process did anyone from GSC notify HOME of its planned order nor did it revise the brochure at that time to include an EHO logo, although other revisions were made. Doug Ziegler testified that revising the brochure to include an EHO logo would have cost approximately $200 to $500.

After execution of the 1983 Conciliation Agreement, GSC began to take steps to comply with its provisions. It developed a fair housing policy statement and distributed it to all employees. It implemented an employee training program in 1983, although unfortunately Betsy King, GSC's Marketing Director with significant advertising responsibilities, had not yet participated in the program as of the date of trial.

Most significant to the instant suit, GSC began implementation of the agreement's advertising provisions. According to Marianne Phillips' testimony, which the Court credits on this issue, GSC attempted to comply with the basic advertising requirements, although errors were made.

Concerning newspaper advertisements, the agreement required such ads to include an EHO slogan or logo by September 1, 1983, unless modifications required the services of a design or advertising agency. Yet it wasn't until late September 1983 that Marianne Phillips discovered that such changes had not been made and advised her staff to make such changes "as soon as is possible."

While, from the evidence presented, the Court finds that GSC generally complied with the agreement's requirements concerning newspaper advertisements, it also finds that GSC exhibited a reluctance to comply, a desire to do only the bare minimum required, and an attempt to advertise its EHO policy as inconspicuously as possible. *See, e.g.*, DX 7, at 2 (admonishing staff to "make sure" that EHO logo is "not the only thing on the line"; PX 18(f) (questioning whether to use EHO logo in new ad in March 1986 after expiration of ad provisions); PX 19 (ads sent to 13 college newspapers without logo during agreement's term); PX 20 (ads sent to 15 college newspapers without logo after expiration of agreement's term); DX 8 (memo requesting that logo be added to group of display ads; requested on last date possible under agreement); DX 35 (note from GSC staff member to Doug Ziegler, asking him to "add in the Equal Housing Opportunity logo discreetly").

On July 5, 1985, HOME's Fair Housing Director wrote to GSC's attorney concerning two areas of apparent non-compliance with the advertising provisions: (1) failure to include an EHO logo in GSC's April 1985 flyer known as "GSC Happenings"; (2) failure of GSC's 38-page *Lifestyle* brochure to include an adequate number of black models, thereby impermissibly indicating a preference based on race.

In response, GSC's attorney agreed to include an EHO logo or slogan on future "Happenings" fliers, but stated that GSC "should not have to undertake the considerable cost of redoing [Lifestyle]." In a later telephone conversation, Marianne Phillips did agree to include an EHO slogan or logo in an insert being planned for inclusion in *Lifestyle*, but stated that GSC would not agree to reprint the brochure itself until the current supply was depleted, which she estimated would take one year.

Because HOME considered GSC's response unsatisfactory, it filed a complaint with HUD and VREC on September 9, 1985, and filed the instant action on April 15, 1986.

Beginning sometime in October 1985, GSC did begin to discuss revisions to *Life-*

*style*, including the use of more black models. (Betsy King's notes concerning meetings on revisions). Notes from these meetings reflect considerable discussion concerning the addition of black models to the brochure; however, again GSC's attitude appeared to be one of reluctance and interest in including blacks as little as possible. For example, Betsy King's notes of the initial meeting held on October 3, 1985, discuss staging "a mock cocktail party that would include 'Marianne's cousins.'" In her deposition, King explained that such term was used as an acronym to refer to blacks. Notes of another conversation with Jon Perel advise that "every prop[erty] has to have 5 people plus 1 minority." A questionnaire circulated by GSC asked the question "Best places for blacks?" and responses included "one or two blk. children" and "groups."

Finally, in a memorandum from Doug Ziegler to Marianne Phillips, John Hunt, and Betsy King discussing specific areas in which revisions would be made, Ziegler wrote the following:

*Swimming:*

Strong need for this throughout. Should we use blacks in this arena? ...

In a meeting held on November 12, 1985, Marianne Phillips' handwritten notes on this memorandum drew a line leading from the question "Should we use blacks in this arena?" to the answer "yes. (not in water per JH.)." While John Hunt, Marianne Phillips and Doug Ziegler all denied that this note referred to an instruction by John Hunt not to photograph blacks in the swimming pool, this Court gives no credence to the explanations tendered. Phillips suggests that her note is not a response to the question "Should we use blacks in this arena," even though she drew a line from that question to the answer. Instead, she states that Hunt merely instructed Ziegler that no one should be photographed in the water because GSC complex logoes recently had been printed on the pool bottoms, and he didn't want models to block those logoes in the photographs.

Such an explanation lacks reason and is dispelled by the evidence. In fact, there are more pictures containing models in the water in the revised brochure than in the original brochure. *See* While, early in the trial, the defendants were eager to point out that there is a picture of a black couple on page 8 of the revised brochure, on cross-examination of a defendant's witness, it was revealed that such picture was only added to the brochure at the last minute— within three weeks prior to trial. While an advertising executive indicated that the picture of black models was added because of a last-minute need, and not to counter the effect of an October memo in the instant lawsuit, such explanation is contradicted by the whole evidence. A comparison of the "Blue Line" and final versions of revised *Lifestyle* demonstrates that the picture of blacks in the pool of page 8 was merely substituted for a picture of whites in the pool, which was then moved to page 30. The only pictures removed from the final version were a picture of a black couple sitting by the pool and a picture of two joggers, for which a stock photo of a white couple in the pool was substituted on page 13. *Compare* DX 2 (final version) *with* PX 51 (Blue Line version).

*The Merits*

Plaintiffs allege four causes of action against the defendants: (1) that GSC committed common law fraud by intentionally misrepresenting the current stock of *Lifestyle* brochures at the time of the conciliation agreement, upon which plaintiffs relied to their detriment; (2) that defendants breached the conciliation agreement by failing to include logoes as required on many of their ads and by failing to use sufficient black models in *Lifestyle*, thus indicating a preference based on race in violation of the Fair Housing Act and, therefore, of the general provisions of the conciliation agreement; (3) that defendants violated the Fair Housing Act by indicating a racial preference in their advertising; and (4) that defendants violated 42 U.S.C. §§ 1981–82 by intentionally using discriminatory advertising, infringing upon plaintiffs' right to contract for rental property.

In addition to generally denying plaintiffs' allegations and that such allegations

entitle plaintiff to any relief, defendants raise several defenses, including: (1) that plaintiffs lack standing; (2) that plaintiffs are barred from their breach of contract claims because they failed to follow the contractual review procedures; and (3) that plaintiffs are barred from claiming a Fair Housing Act or Sections 1981 and 1982 claim concerning *Lifestyle* due to the release provisions in the conciliation agreement.

## I. *Standing*

As a preliminary matter, the Court must address defendants' contention that plaintiffs lack standing to raise the instant claims. Defendants allege that both HOME and Saunders lack standing to raise claims under the Fair Housing Act and under 42 U.S.C. §§ 1981 and 1982. Because the requirements for individual and organizational standing are somewhat different, defendants' contentions as to HOME and Saunders must be addressed separately.

■ In general terms, "the question of standing is whether the litigant is entitled to have the Court decide the merits of the dispute or of particular issues. This inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise...." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). The constitutional limitation involves the requirement that plaintiff "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979). Even when such limitation is overcome, a plaintiff still may lack standing based on "prudential principles by which the judiciary seeks to avoid deciding questions of broad social import where no individual rights would be vindicated and to limit access to the federal courts to those litigants best suited to assert a particular claim." *Id.* at 99–100, 99 S.Ct. at 1608. However, Congress may statutorily expand standing to the full limits of Article III, thereby circumventing such prudential bars to standing. *Id.* at 100, 99 S.Ct. at 1608.

### A. *HOME's Standing under Fair Housing Act*

■ Standing under the Fair Housing Act is as broad as permitted by Article III of the Constitution and, thus, is not limited by prudential principles. *See Trafficante v. Metropolitan Life Insurance Co.*, 409 U.S. 205, 209, 93 S.Ct. 364, 366, 34 L.Ed.2d 415 (1972). Thus, defendants' claim that HOME lacks standing to pursue the instant Fair Housing Act claim is based on their contention that it has suffered no distinct and palpable individual injury, nor have its members suffered such injury so as to confer representational standing.

#### 1. *Individual Standing*

Both plaintiffs and defendants recognize, and the Court agrees, that *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982), provides the appropriate test for determining whether HOME has individual standing to sue on the instant claim. As in the instant case, *Havens Realty* addressed the issue of whether HOME had standing in its own right to raise a Fair Housing Act claim for damages. Unlike the instant case, HOME's claim was based on allegedly discriminatory steering practices by the defendant, and not allegedly discriminatory advertising practices. However, in the Court's view, such distinction does not affect the applicability of the underlying principles established in *Havens Realty* to the instant case.

In *Havens Realty*, the Court held that HOME without question alleged a sufficient injury-in-fact to confer standing by its allegations that defendants' steering practices "have perceptibly impaired HOME's ability to provide counseling and referral services for low- and moderate-income homeseekers." *Id.* at 379, 102 S.Ct. at 1124. The Court held that "[s]uch concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the

organization's abstract social interests." *Id.*

While defendants argue that *Havens Realty* requires HOME to point to specific financial expenditures or employment of individuals caused by GEC's alleged violations in order to establish standing, such interpretation is not justified. HOME need only show some perceptible "impairment in its role of facilitating open housing" due to GSC's activities, and not specific quantifiable expenditures. *See Havens Realty*, 455 U.S. at 379 n. 21, 102 S.Ct. at 1125 n. 21. The mere fact that HOME did not need to employ additional personnel, such as the testers employed in *Havens Realty*, does not mean that GSC's activities caused no drain on the organization's resources. If HOME can demonstrate that it has been forced to "devote significant resources to identify and counteract" GSC's allegedly discriminatory advertising practices and that such practices have frustrated HOME's "efforts to assist equal access to housing through counseling and other referral services," it has satisfied the constitutional standing requirement. *Id.*

■ In the Court's view, such requirement was satisfied by the testimony of Kent Willis, the Executive Director of HOME, and Renee Saunders, HOME's Fair Housing Director. Both Saunders and Willis testified, and the log entries in plaintiff's Exhibit 63 confirm, that HOME's staff was forced to spend significant time investigating GSC's advertising practices and attempting to counteract the alleged discriminatory advertising they found in *Lifestyle*. While it may be true that some of this time was spent on activities necessary to the instant lawsuit, such contention does not negate the establishment of standing. In *Havens Realty*, certainly the testers' activities provided necessary evidence to form the basis for HOME's lawsuit, but such activities were still relevant in establishing standing. Willis testified that time spent in such activities diverted HOME's time and attention from its other programs, such as its education, counselling and referral services.

The Court finds such testimony sufficient to establish HOME's standing to bring the instant Fair Housing Act claim. It is clear that HOME spent considerable time and human resources in investigating its complaint about *Lifestyle* and attempting to resolve it. Thus, GSC's allegedly discriminatory advertising has caused a concrete injury to HOME, which can be adequately redressed by the relief sought.

### 2. *Representational Standing*

■ HOME also contends that it has standing to bring the instant suit on behalf of its members. In order to have representational standing, an association must establish that: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington Apple Advertising Commission*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 55 L.Ed.2d 383 (1977).

The Court is satisfied that HOME has established the latter two of these requirements. Clearly, the interests HOME seeks to protect in bringing the instant suit are germane to its organizational purposes of ensuring equal and open housing opportunities and ensuring the enforcement of fair housing laws, as testified to by Kent Willis and contained in HOME's by-laws. *See* PX 62(a).

Further, neither the claim asserted nor the relief requested require the participation of individual members in the instant suit. As in a recent Supreme Court case interpreting this requirement, the instant suit "raises a pure question of law," i.e., whether *Lifestyle* indicated a preference based on race, and it is not necessary for the Court to consider the individual circumstances of any aggrieved member. *See International Union, UAW v. Brock*, —— U.S. ——, ——, 106 S.Ct. 2523, 2532, 91 L.Ed.2d 228 (1986).

The first requirement for representational standing—that the organization's members would otherwise have standing to sue

in their own right—poses a more difficult obstacle for HOME. As plaintiff, HOME bore the burden of proving at trial that "its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit." *International Union, UAW,* —— U.S. at ——, 106 S.Ct. at 2529 (quoting *Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 2211, 45 L.Ed.2d 343 (1975)).

■ Defendant contends, correctly in the Court's view, that plaintiff HOME has failed to present any evidence of injury to its members and thus lacks standing. While plaintiff's mere allegations of injury would be sufficient to overcome a pre-trial motion to dismiss, at trial it was necessary for plaintiffs to establish some evidence that such injury in fact occurred to at least some of its members as a result of defendant's alleged violation. *See Havens Realty,* 455 U.S. at 379 n. 21, 102 S.Ct. at 1125 n. 21; *see also U.S. v. Students Challenging Regulatory Agency Procedures,* 412 U.S. 669, 688–89, 93 S.Ct. 2405, 2416–17, 37 L.Ed.2d 254 (1973) (allegations of harm "must be true and capable of proof at trial").

Admittedly, in a case under the Fair Housing Act, the burden is not a particularly heavy one. As the Supreme Court explained in *Havens Realty,* Congress intended standing under the Act to be as broad as Article III allows. For this reason, the Court held that testers had standing to claim a violation of the Act by mere proof that the defendants had misrepresented housing availability information to them, regardless of whether they in fact were interested in such housing and would be harmed by the inability to obtain it. The Court reasoned that, under the Act, a party is injured by the mere fact of receiving such misrepresentations.

In the same way, HOME could have shown injury to its members by proof that any of such members had seen *Lifestyle* in its original version. Under the *Havens Realty* rationale, such members would be injured by their mere receipt of advertising indicating a preference based on race. However, no such evidence was presented. Kent Willis testified that HOME has 400 to 500 contributing members who, according to the by-laws, share HOME's goals of encouraging equal housing opportunity and compliance with fair housing laws. However, neither he nor anyone else provided any connection between any of HOME's members and the *Lifestyle* brochure, or, for that matter, any of GSC's activities or advertising. Without such evidence, there is inadequate proof that HOME, as a representative of its members, possesses the required stake in the instant controversy.

### B. *Saunders' Standing Under Fair Housing Act*

While defendants argue that Saunders has failed to establish a concrete injury resulting from GSC's alleged violation of the Act, such argument is without merit. Saunders' uncontradicted testimony established that she reviewed the *Lifestyle* brochure in January or February 1985 as part of her search for housing in the Richmond area. She noticed and was deeply offended by the virtual absence of blacks in the brochure, which indicated to her, quite understandably, that GSC did not wish to appeal to blacks. Because of her strong negative reaction to the brochure, Saunders did not consider living in any of GSC's properties after that incident.

■ Such testimony is more than sufficient to establish that Saunders suffered a real and concrete injury due to GSC's acts under the rationale of *Havens Realty.* The Court reaffirmed there that "[t]he actual or threatened injury required by Art. III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing." *Havens Realty,* 455 U.S. at 373, 102 S.Ct. at 1121 (quoting *Warth v. Seldin,* 422 U.S. 490, 500, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975)). Just as the tester in *Havens Realty* suffered a statutorily recognized injury when he received an unlawful representation, so did Saunders receive an injury under the Act when she received an unlawful advertisement indicating a tenant preference based on race. *See*

*Havens Realty,* 455 U.S. at 373–74, 102 S.Ct. at 1121–22.

### C. *HOME's Standing Under 42 U.S.C. §§ 1981–82.*

■ Defendants contend that HOME lacks standing either individually or on behalf of its members to raise the instant claim under 42 U.S.C. §§ 1981 and 1982, based on the Court's prudential limitations on its exercise of jurisdiction. Unlike the Fair Housing Act, Sections 1981 and 1982 do not create a statutory right which confers standing even where plaintiff would otherwise have no judicially cognizable injury. Therefore, the Court is not required to extend standing under Sections 1981 and 1982 to the full limits of Article III and may invoke prudential limitations. *See Warth v. Seldin,* 422 U.S. 490, 513–14, 95 S.Ct. 2197, 2212–13, 45 L.Ed.2d 343 (1975). Such limitations include a policy against exercising jurisdiction when the asserted injury is merely a " 'generalized grievance' shared in substantially equal measure by all or a large class of citizens" or where a plaintiff "rest[s] his claim to relief on the legal rights or interests of third parties." *Id.* at 499, 95 S.Ct. at 2205. Defendants assert that both of these prudential limitations should be applied to the instant case.

Defendants contend that HOME's claim for damages under Sections 1981 and 1982 "fall[s] squarely within the prudential standing rule that normally bars litigants from asserting the rights or legal interest of others in order to obtain relief from injury to themselves." *Warth v. Seldin,* 422 U.S. 490, 509, 95 S.Ct. 2197, 2210, 45 L.Ed.2d 343 (1975). In addition, defendants allege that HOME lacks individual injury and has at most suffered injuries shared equally by all or most citizens.

The Court notes initially that HOME has alleged sufficient injury-in-fact to overcome any constitutional limitation on standing. As discussed concerning Fair Housing Act violations, defendants' alleged violations of Sections 1981 and 1982 have forced HOME to devote significant resources to combat such violation, thereby frustrating its efforts to insure equal housing opportunities

and diverting its resources from other programs. *See Havens Realty,* 455 U.S. at 379, 102 S.Ct. at 1124. Clearly, such injuries are not of a type generally shared by all citizens.

■ The Court finds, however, that prudential limitations do militate against according HOME individual standing under Sections 1981 and 1982. While courts have recognized that the Fair Housing Act confers broad standing upon individuals, standing under the Civil Rights Act is more limited. *See Warth v. Seldin,* 422 U.S. at 512–14, 95 S.Ct. at 2212–13. HOME itself has not been denied any constitutional rights by GSC's actions; instead, HOME claims that it has been harmed indirectly by defendants' violation of the rights of others. In these circumstances, the Court concludes that it is inappropriate to afford standing to HOME. *See id.* at 514, 95 S.Ct. at 2213.

### 2. *Representational Standing*

■ While HOME might have had standing to raise Section 1981 and 1982 claims on behalf of its members, it has failed to prove its entitlement, as already discussed concerning the Fair Housing Act claims. HOME offered no proof at trial that any of its members suffered injury to their rights to contract for property due to defendants' alleged acts. Without such proof, HOME has failed to establish a necessary prerequisite to organizational standing—that its members would have had standing to bring the instant claims themselves. *See Hunt,* 432 U.S. at 343, 97 S.Ct. at 2441.

### D. *Saunders' Standing Under Sections 1981 and 1982*

■ While defendants contend that Sections 1981 and 1982 provide no cause of action for the discriminatory advertising alleged by plaintiffs, if such conduct does violate the instant statutes, Saunders certainly has standing to raise such claims. Saunders is a black citizen who allegedly was discouraged from leasing housing from the defendants because of its discriminatory advertising, which indicated to her that she was not welcome. Therefore,

plaintiff has established a concrete injury to her statutory rights caused by defendants' alleged violations.

## II. *Common Law Fraud Claim*

The Court notes initially that it has pendent jurisdiction over the instant state law fraud and breach of contract claims under *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The Court finds that such claims and the federal claims asserted derive from a common nucleus of operative facts and that none of the discretionary factors delineated in *Gibbs* militate against this Court's exercise of jurisdiction.

Turning to the substance of HOME's claim, under Virginia law, plaintiff must prove by clear and convincing evidence the following elements: (1) a false representation of a material fact; (2) made knowingly and intentionally; (3) with the intent to mislead; (4) reliance by the misled party; and (5) damages resulting from such reliance. *Winn v. Aleda Construction Co.,* 227 Va. 304, 315 S.E.2d 193 (1984). Plaintiff has produced sufficient evidence of each of these elements to satisfy the conscience of the Court that defendants committed a fraud.

### A. *False Representation of Material Fact*

■ Virginia law provides a cause of action for fraud acting as an inducement to entering a contract, such as the conciliation agreement at issue in the instant action. *See, e.g., Nationwide Mutual Insurance Co. v. Martin,* 210 Va. 354, 171 S.E.2d 239 (1969) (settlement agreement voidable based on fraudulent statements made by insured inducing insurer to sign contract).

Such fraud may exist based on the suppression or concealment of true facts, as well as on the affirmative representation of a false set of facts. The Virginia Supreme Court has held that

> If a party conceals a fact that is material to the transaction, knowing that the other party is acting on the assumption that no such fact exists, the concealment is as much a fraud as if the existence of the fact were expressly denied or the reverse of it expressly stated.

8B Michie's Jur. *Fraud and Deceit* § 15, at 300 (1977); *see also A & E Supply Co. v. Nationwide Mutual Fire Insurance Co.,* 612 F.Supp. 760, 769 (W.D.Va.1985), *rev'd on other grounds,* 798 F.2d 669 (4th Cir. 1986); *Clay v. Butler,* 132 Va. 464, 112 S.E. 697 (1922).

In the instant case, the Court finds that, in the process of negotiating the advertising provision concerning *Lifestyle,* Marianne Phillips and GSC's attorney, acting as agents of GSC, represented to HOME that GSC had approximately a two-month supply of the brochure on hand, a statement which apparently was true when made. Such representation was relied upon by HOME's officials, Wurtzel and Harms, in agreeing to the provision that delayed inclusion of the EHO logo in such brochures until "the current supply is reprinted." The Court further finds that GSC was aware, or should have been aware, of the importance of this representation to HOME in agreeing to that provision.

The issue before the Court, then, is whether GSC acted fraudulently when it failed to disclose to HOME its order of 134,000 copies of *Lifestyle* on June 15, 1983 —shortly before the conciliation agreement was executed.

The Court finds that, under the surrounding circumstances, the concealment of such order clearly constituted a fraud inducing HOME to enter into the conciliation agreement. The size of GSC's June 15th order was unprecedented in GSC's history. In fact, the order was so large that it was stored at the printer's office and shipped to GSC on a piecemeal basis as further supplies were needed. According to Phillips' own testimony, the supply was intended to last for at least one year, and in fact, lasted for more than two years—in effect rendering meaningless the advertising provision concerning printed materials because GSC's supply was not reprinted until after the expiration of such provision.

Further, GSC elected not to voluntarily revise *Lifestyle* at this time to include an EHO logo, despite the fact that other revi-

sions were made and inclusion of the logo would have added *de minimus* expense.

Certainly, the concealment of the order from HOME created a false impression to HOME that GSC's *Lifestyle* supply continued to be small, as Phillips had earlier represented, and that within a relatively short time GSC would need to reprint *Lifestyle* and would then include the EHO logo pursuant to the conciliation agreement.

Neither can there be any question that the extent of GSC's *Lifestyle* supply was a material fact of importance to HOME in agreeing to the advertising provision suggested by GSC, which was different than HOME's standard provision in such agreements. The evidence is undisputed that, in HOME's view, such provisions were a vital portion of any conciliation agreement. Common sense dictates that a party would not agree to a provision with a delayed effective date if it knew of facts indicating that such provision would never take effect. Thus, the Court is convinced that defendants, by concealment, made a false representation of material fact.

### B. *Representation Made Knowingly and Intentionally*

While not surprisingly defendants deny that they intended to conceal facts from HOME, the Court is convinced that such intent is shown by circumstantial evidence.

Marianne Phillips must have been aware that the extent of GSC's *Lifestyle* supply was material to HOME's agreement to accept GSC's suggested advertising provision, based on common sense and on GSC's inquiry concerning such supply. Phillips also was the individual responsible for deciding to place the larger order, which then was approved by Jon Perel. At the time Phillips placed the order, she was well aware of the ongoing negotiations concerning the conciliation agreement, as she was GSC's main negotiator. Further, the evidence shows that the advertising provisions had been negotiated months earlier.

Finally, order of the large supply and its printing occurred in such close proximity to the time the conciliation agreement was signed that Phillips had to have realized the effect that such order would have on the advertising provisions and the importance of revealing this information to HOME. In fact, the printing records produced reveal that the order was being filled throughout the month of July—the month in which the conciliation agreement was signed. At the very time, GSC was agreeing to include an EHO logo on its brochures when reprinted, it was reprinting a supply so extensive that it would never be required to comply with such provision. Such conduct constitutes a classic case of fraudulent concealment.

### C. *Reasonable Reliance*

Additionally, plaintiff must prove that it reasonably relied on the fact that GSC had a small *Lifestyle* supply in signing the conciliation agreement. In the Court's view, there is no question that HOME had a right to rely on Phillips' earlier statement that the *Lifestyle* supply was small and to rely on GSC to correct such representation if it became inaccurate. Such facts were peculiarly within the knowledge of the defendants, and the law does not require plaintiff to continue to investigate and make inquiries when representations have been made by the defendant at the relevant time—when the relevant term was being negotiated. It would be unreasonable to expect HOME to make continued inquiries as to the *Lifestyle* supply after Phillips' initial representation. Finding no evidence that plaintiff in fact had knowledge of the large supply or had made independent inquiry, the Court is satisfied that plaintiff has proven reasonable reliance.

### D. *Damages*

Finally, plaintiff must show that it was damaged by defendants' fraudulent concealment—a burden which only requires proof of some injury. The testimony of Kent Willis, as well as other HOME officials, clearly establishes that HOME was so injured.

Affirmative advertising plays an important role in HOME's responsibility to ensure equal housing opportunity, and inclusion of the EHO logo in advertisements is

one of HOME's primary means of ensuring that the message of equal housing availability is conveyed to the public.

HOME was injured by GSC's fraud because it vitiated the advertising provisions of the conciliation agreement, thus thwarting HOME's fair housing goals and its attempt to obtain a meaningful settlement of its dispute with GSC.

### E. *Remedy*

■ Having determined that GSC committed fraud inducing HOME to enter into the conciliation agreement, the Court must determine the most appropriate remedy to rectify such fraud. In the instant case, the Court finds that HOME is entitled to rescission of the conciliation agreement, as it would be manifestly unfair to bind it to the terms of such agreement when it would not have entered such agreement but for defendant's fraud.

■ It is well-settled law that a contract induced by fraud is voidable at the option of the party injured by the fraud. *See, e.g., United States v. Idlewild Pharmacy, Inc.,* 308 F.Supp. 19 (E.D.Va.1969). Two requirements must be met, however, before rescission may be granted. First, the party desiring to rescind must act with due diligence in claiming fraud once it has been discovered. *Id.* at 23. Second, such party must restore any monies received under the contract in order to place the parties *in status quo. See, e.g., Edmunds v. Chandler,* 203 Va. 772, 127 S.E.2d 73 (1962). However, such restoration need not be "[a]bsolute and literal," but only such as is "reasonably possible and demanded by the equities of the case." *Id.* at 779, 127 S.E.2d at 78. Further, such requirement is not to be strictly construed, but instead to be applied in accordance with general equitable principles. *Delta Investing Corp. v. Moore,* 366 F.2d 516, 520 (6th Cir.1966). Assuming such requirements are met, the decision to grant rescission rests within the sound discretion of the Court in the exercise of its broad remedial powers under its equity jurisdiction. *See Smith v. Town of Clarkton,* 682 F.2d 1055, 1068 (4th Cir.1982) (court has "broad and flexible equitable powers to fashion a reme-dy that will correct past wrongs" in cases involving statutory or constitutional violations of civil rights).

In the instant case, plaintiff has met both prerequisites to rescission. It acted diligently in asserting its fraud claim once such claim was discovered, moving to amend the complaint in the instant action to add a fraud count soon after it discovered the supply order forming the basis of its fraud claim during the discovery process in the present case.

Concerning plaintiff's obligation to restore GSC to a status quo position, the Court may ensure such restoration in its fashioning of a remedy. Plaintiff received $2,000 from GSC in consideration of its release of claims as part of the conciliation agreement. Defendant clearly is entitled to return of such sum, for to do otherwise would allow plaintiff to be relieved of its contractual obligations while retaining the contract's benefits. In the instant case, the Court finds that restoration may be accomplished, consonant with general equitable principles and the policy underlying restoration, by requiring plaintiff HOME to offset the $2,000 restoration required against any reward it receives against defendant in the instant action.

### III. *Breach of Contract Claims*

Plaintiff HOME asserts that defendants breached the conciliation agreement in several respects, primarily related to use of the EHO logo in its advertising. Defendants counterargue, in addition to alleging that no such breaches occurred, that plaintiff failed to follow the contractual procedure for resolution of such complaints, thus barring the instant claim.

The Court need not resolve such dispute because of its finding that plaintiff was induced to enter the conciliation agreement by defendants' fraudulent concealment and decision to rescind the agreement on that basis.

### IV. *Fair Housing Act Claim*

#### A. *Substance of Claim*

Plaintiffs' next cause of action arises under the Fair Housing Act, 42 U.S.C. § 3604(c). That section makes it unlawful:

[t]o make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, or national origin, or an intention to make any such preference, limitation, or discrimination.

Plaintiffs argue, in what appears to be a case of first impression, that defendants violated such provision in the publication of the *Lifestyle* brochure. They contend that the virtual absence of black models from the sixty-eight photographs in that brochure containing human models indicates a preference or an intention to make a preference based on race.

■ In order to prove a violation of this subsection, plaintiffs need not establish that defendants intended to express a racial preference. *See, e.g., Metropolitan Housing Development Corp. v. Village of Arlington Heights,* 558 F.2d 1283 (7th Cir. 1977), *cert. denied,* 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978). Rather, one court has held that a violation is proven if "[t]o an ordinary reader the natural interpretation of the advertisements published in the [newspaper] is that they indicate a racial preference in the acceptance of tenants." *United States v. Hunter,* 459 F.2d 205, 215 (4th Cir.), *cert. denied,* 409 U.S. 934, 93 S.Ct. 235, 34 L.Ed.2d 189 (1972). In *Hunter,* the Fourth Circuit held that a classified advertisement, listing an apartment for rent "in private white home," indicated a racial preference in violation of the Act. The Court reasoned that such interpretation of the statute was consonant with the broad congressional objective underlying the Act of combating racial discrimination in housing. *Id.* 459 F.2d at 214–15. The Court also cited HUD advertising guidelines as support for its position. *Id.* at 215 n. 11.

In the instant case, then, the Court must determine from the conflicting evidence whether the *Lifestyle* brochure's paucity of black models indicates a racial preference to the ordinary reader.

■ While the Court believes that the evidence is mixed on the instant issue, it finds that plaintiffs have proven their claim by a preponderance of the evidence. Both of plaintiffs' experts, Dr. Barban and Mr. Franklin, have done considerable academic and market research on the effect of the racial composition of advertising models on the consumer. Both testified that, in their opinion, the *Lifestyle* brochure indicated a preference for white tenants and a subtle message that black tenants would be less welcome. While the Court is not unduly impressed by their research methodology and basis for their opinions, their findings do comport with the average layman's knowledge of advertising. It requires no expert to recognize that human models in advertising attempt to create an identification between the model, the consumer, and the product. In other words, advertisers choose models with whom the targeted consumers will positively identify, hoping to convey the message that people like the depicted models consume and enjoy the advertised product. Therefore, if the consumer wants to emulate the model, he or she will use the product, too.

Thus, it is natural that readers of the *Lifestyle* brochure would look at the human models depicted as representing the kinds of individuals that live in and enjoy GSC apartment complexes. If a prospective tenant positively identified with these models, the message conveyed would be that "I belong in these apartments. 'My kind of people' live there." Conversely, if the prospective tenant reading the brochure saw no models with whom he or she could identify, the reader would obtain a message that "these apartments are not for me or 'my kind.' "

Thus, the Court finds that the natural interpretation of the *Lifestyle* brochure is to indicate that GSC apartment complexes are for white, and not black, tenants, thus discouraging blacks from seeking housing there.

GSC's own documents demonstrate that it was aware that the models used would affect the types of tenants attracted and that it intended to indicate preferences for

certain types of tenants. For example, in a memo from Jon Perel to Doug Ziegler, Perel suggested various ideas to be used in the advertising brochure for one of GSC's properties to convey its "institutional/upper income/exclusivity approach." Further, when GSC recently decided to revise its *Lifestyle* brochure, it circulated a questionnaire to management members, asking how the brochure should "treat children, seniors" and where were the "best places for blacks," indicating again the importance GSC placed on the placement of human models.

Finally, the Court considers a memorandum asking "Should we use blacks in this arena [swimming]?" which contains Phillips' handwritten note responding "Yes (not in water per J.H.)." The Court finds absolutely incredible Phillips' and Hunt's explanation that this note did not refer to the use of blacks in pool pictures, but merely to a general desire not to photograph human models in the pool. The totality of the evidence clearly indicates that Hunt was concerned about showing blacks in GSC pools, again demonstrating GSC's own belief that the race of models used would indicate GSC's racial preferences.

Plaintiffs also presented the testimony of Renee Saunders and Earl Danzler, both of whom testified that they immediately noticed the absence of blacks in GSC's advertising and received the message that GSC did not wish to appeal to blacks. Finally, Mr. Franklin conducted a study which, despite many methodological weaknesses, provides some additional evidence that blacks interpreted *Lifestyle* to indicate a preference for white tenants.

While defendants' expert, Dr. Loftus, did raise several valid concerns about the studies and conclusions offered by plaintiffs' experts, she did not, in the Court's view, adequately refute plaintiffs' evidence that *Lifestyle* indicates a racial preference.

### B. *Liability of Defendant Perel*

Having determined that GSC's use of the *Lifestyle* brochure violated the Act, the Court must determine whether the defendant, Jon Perel, is liable for such violation.

Under the Fair Housing Act, a corporation and its officers "are responsible for the acts of a subordinate employee [in violation of the Act], even though these acts were neither directed nor authorized." *Harrison v. Otto G. Heinzeroth Mortgage Co.*, 430 F.Supp. 893, 897 (N.D.Ohio 1977); *see also United States v. L & H Land Corp.*, 407 F.Supp. 576, 580 (S.D.Fla.1976). Courts have followed this rule even where "it seems harsh to punish innocent and well-intentioned employers" because the statutory duty not to discriminate is non-delegable. *Harrison*, 430 F.Supp. at 896–97; *L & H Land Corp.*, 407 F.Supp. at 580.

Thus, in the instant case, while the Court finds credible Mr. Perel's testimony that he did not intend to discriminate and that he supports the goals of equal and open housing, as president of GSC, Mr. Perel had a non-delegable duty to ensure that GSC, through its employees, followed such goals and complied with the Act. He failed in such duty and must be held jointly liable with the corporation for the instant violation.

### C. *Remedies*

Having determined that defendants have violated the Act, the Court now must determine the appropriate relief for such violation. Plaintiffs seek declaratory and injunctive relief as well as monetary damages, each of which must be addressed in turn.

Concerning its request for declaratory and injunctive relief, plaintiffs ask the Court to declare that defendants' publication of *Lifestyle* violated the Act, enjoin defendants from any further racial discrimination under the Act, and order defendants to modify their advertising to comply with the law, including blacks in their advertising in numbers proportionate to their percentage in the population of the Richmond metropolitan area. In the Court's view, the relief sought is unnecessary and overbroad.

While it is true that a Court may award affirmative injunctive relief in order to remedy past discriminatory advertising

practices, such decision rests within the sound discretion of the trial court, based on whether it believes "the vestiges of prior discrimination linger and remain to be eliminated." *United States v. Hunter, supra,* 459 F.2d at 220 n. 21. As the Court held in *Hunter* in affirming the district court's decision to grant declaratory, but not injunctive relief, "in considering whether to grant injunctive relief a court should impose upon a defendant no restriction greater than necessary to protect the plaintiff from the injury of which he complains." *Id.* at 219. Thus, the Court should not grant injunctive relief unless "there exists some cognizable danger of recurrent violation." *Id.* (quoting *United States v. W.T. Grant Co.,* 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953)).

■ In the instant case, while declaratory relief is appropriate, the Court is not convinced that a cognizable danger exists that defendants will continue to violate their advertising obligations under the Act. In fact, although perhaps induced by the instant litigation, defendants have subsequently revised *Lifestyle* to increase the use of black models. Plaintiffs' own experts testified that the revised brochure did not indicate a racial preference. The Court finds that a declaratory judgment, combined with monetary damages, will adequately redress plaintiffs' injuries and provide assurances that defendants will not engage in future violations.

In addition, the Court finds that plaintiffs are not entitled by law to force defendants to give proportional representation to blacks in their advertising, nor is there any evidence in the record that such representation would be necessarily required to avoid indicating a racial preference.

Plaintiff, HOME, however, also seeks compensatory damages to compensate HOME for impairment of its role in facilitating fair housing and for diversion of its resources from its other activities in order to combat the instant violations. As evidence of such damages, HOME has provided records of time spent by HOME staff members in investigating and attempting to resolve the violations which form the basis of the instant action and have assigned an hourly rate to such time, based on the employees' salary, fringe benefits, and a portion of office overhead. *See* PX 63. In addition, plaintiff Saunders seeks monetary damages based on her feelings of loss of dignity and humiliation from reading *Lifestyle* and seeks punitive damages to deter GSC from future unlawful conduct.

Under the Fair Housing Act, prevailing plaintiffs may be awarded their "actual damages and not more than $1,000 punitive damages, together with court costs and reasonable attorney fees." 42 U.S.C. § 3612(c). The Supreme Court has held that a fair housing organization may recover compensatory damages under the Act for impairment of its objectives and diversion of its resources. *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 379, 102 S.Ct. 1114, 1124, 71 L.Ed.2d 214 (1982). In the instant case, HOME, therefore, is entitled to recover such damage which resulted from the Fair Housing Act claim.

■ To determine a value for the diversion of resources caused by the instant claim, the Court may consider plaintiff's records of time and overhead costs attributable to pursuing such claim, which totalled $2,300. While plaintiff may not be entitled to recover such investigative costs *per se,* such costs offer a reasonable guideline for ascertaining the value of plaintiff's "diversion of resources" element of damage, and such sum is thereby awarded.

■ In addition, HOME is entitled to compensation for damage to its fair housing goals resulting from the instant claim. There was considerable testimony during trial concerning the paramount importance of non-discriminatory advertising in furthering HOME's mission of ensuring equal housing opportunities. The importance of such advertising is highlighted by the central role the affirmative advertising provisions play in HOME's conciliation agreements. In today's market, obviously advertising plays a pivotal role in providing housing information to the public. Thus, when one of the largest providers of hous-

ing in the Richmond area—GSC—publishes advertising such as *Lifestyle* on a large scale which conveys a message that it prefers white tenants, such advertising has a subtle, but substantial, impact on HOME's mission of ensuring equal housing and conveying the availability of equal housing to the public. Thus, the Court finds it appropriate to award damages of $10,000 to HOME based on defendants' frustration of its equal housing mission.

■ Plaintiff Saunders also seeks compensatory damages under the Act for her emotional distress and humiliation as a result of viewing *Lifestyle.* Such damages are compensable under the Act. *See, e.g., Smith v. Anchor Building Corp.*, 536 F.2d 231, 236 (8th Cir.1976).

■ In the instant case, Ms. Saunders' testimony left no doubt that she was deeply affected by the message conveyed to her by *Lifestyle*—that she, as a black person, was not welcome in GSC apartment complexes. As Ms. Saunders explained, one does not "get used to" the experience of feeling unwelcome in our society. More importantly, in 1987, "no one should have to toughen themselves to racial discrimination." *Davis v. The Mansards, Inc.*, 597 F.Supp. 334, 347 (N.D.Ind.1984) (awarding $5,000 to plaintiff tester for emotional distress caused by discriminatory rejection of housing application). For those of us fortunate enough not to have experienced such discrimination, it may be difficult to imagine the emotional impact of feeling unwelcome in one's own community; for Ms. Saunders, it is not. Given Ms. Saunders' distress, the Court believes that an award of $2,500.00 in actual damages is appropriate.

■ Further, the plaintiffs seek punitive damages, which are allowable under the Act up to $1,000. Such damages are appropriate when plaintiffs have proven that defendants acted wantonly or willfully or were motivated by ill will, malice, or a desire to injure the plaintiffs. *See, e.g., Phillips v. Hunter Trails Association*, 685 F.2d 184, 191 (7th Cir.1982). The Court finds insufficient evidence that such motive or state of mind existed. Rather, the Court

finds that the actions of defendants Perel and GSC, through its agents, while intentional, lacked the requisite malice for awarding punitive damages. Further, because this Housing Act issue is one of first impression, the defendants did not have clear legal authority that their conduct was prohibited. While knowledge of a recent decision making alleged conduct cognizable does not affect enforcement of a statute, it is relevant to the wilfulness or wantonness requirement for the award of punitive damages. *See, e.g., Lee v. Southern Home Sites Corp.*, 429 F.2d 290, 294 (5th Cir. 1970). Thus, the Court finds an award of punitive damages inappropriate.

## V. *Section 1981 and 1982 Claims*

Plaintiffs allege that defendants' discriminatory advertising practices also violate the Civil Rights Act of 1866, 42 U.S.C. §§ 1981–82. The Court deals with these claims jointly because the Supreme Court has held that the reach of these statutes is coextensive. *See, e.g., Tillman v. Wheaton-Haven Recreation Association*, 410 U.S. 431, 440, 93 S.Ct. 1090, 1095, 35 L.Ed.2d 403 (1973).

Plaintiffs contend that because *Lifestyle* indicated a preference based on race, black persons were denied an equal right to make a contract for the rental of GSC property under Sections 1981 and 1982.

Defendants argue that plaintiffs are not entitled to recover under either section both factually and as a matter of law. Initially, they assert that, even if defendants' publication of *Lifestyle* constituted a form of intentional discrimination, such discrimination is not cognizable under Sections 1981 and 1982. They further contend that, even if plaintiffs' allegations do state a cause of action under these statutes, plaintiffs have failed to prove that defendants had the requisite discriminatory intent.

## A. *Scope of Sections 1981 and 1982*

In the first instance, the Court must determine whether the conduct alleged—defendants' intentional discrimination in pub-

lishing advertising that indicates a preference based on race—constitutes a violation of Section 1981 and/or 1982. Such determination appears to present an issue of first impression, at least among published authority.

### 1. *Section 1982*

■■■ Plaintiffs allege that defendants' discriminatory advertising practices violate the Civil Rights Act of 1866, 42 U.S.C. § 1982, which provides:

> All citizens of the United States shall have the same right, in every state and territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.

They contend that because *Lifestyle* indicated a preference based on race, black persons were denied an equal right to make a contract for the rental of GSC property.

Defendants assert that § 1982 does not encompass such advertising claim, citing *dictum* in a 1968 Supreme Court decision as authority for their assertion. *See Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 413, 88 S.Ct. 2186, 2189, 20 L.Ed.2d 1189 (1968).

In *Jones*, the specific issue before the Court involved whether § 1982 applied to private, and not only state, action in the sale or rental of property and, if so, whether such scope was constitutional. In beginning its examination of the scope of § 1982, the Court compared § 1982 to the Fair Housing Act. Unlike the Fair Housing Act, the Court explained, § 1982 "is not a comprehensive open housing law." *Id.* at 413, 88 S.Ct. at 2189. The Court then noted several differences between the scope of the two statutes, noting as follows:

> [Section 1982] does not deal specifically with discrimination in the provision of services or facilities in connection with the sale or rental of a dwelling. *It does not prohibit advertising or other representations that indicate discriminatory preferences.* It does not refer explicitly to discrimination in financing arrangements or in the provision of brokerage services.

*Id.* (emphasis added).

In a footnote to the above-quoted language, the Court explained that, although § 1982 does not specifically address discrimination in the provision of services or facilities, financing arrangements or brokerage services, the Court "intimates no view" upon whether such discrimination still might be covered under §§ 1982 and/or 1981. *Id.* at 413 n. 10, 88 S.Ct. at 2189 n. 10. Notably, the Court did not apply such disclaimer to its statement that discriminatory advertising is not prohibited by § 1982.

In summary of the comparison between the two statutes, the Court noted the "vast differences between, on the one hand, a general statute applicable only to racial discrimination in the rental and sale of property and enforceable only by private parties acting on their own initiative, and, on the other hand, a detailed housing law, applicable to a broad range of discriminatory practices and enforceable by a complete arsenal of federal authority." *Id.* at 417, 88 S.Ct. at 2191.

Plaintiffs argue, correctly in the Court's view, that the Supreme Court's statements in *Jones* concerning preferential advertising, an issue not before the Court, do not constitute binding authority on the instant issue. While we agree that such statements in *dictum* do not create binding precedent, however, they do provide insight into the Supreme Court's interpretation of the intended scope of § 1982.

As interpreted in *Jones*, § 1982 "must encompass every racially motivated refusal to sell or rent." *Id.* at 421–22, 88 S.Ct. at 2194. A survey of housing discrimination cases supports the interpretation that § 1982 prohibits *refusals* to sell or rent based on race, and not the mere expression of a *preference* to sell or rent based on race. Under the plain language of the statute itself, advertising that indicates a racial preference, while it may discourage blacks from exercising their right to rent certain property, does not deny them the opportunity to rent such property.

Thus, the Court finds no basis for interpreting § 1982 to apply to advertising indicating a racial preference. Certainly, the effect of such advertising can be as discriminatory and devastating as a direct refusal to rent. Congress presumably recognized this fact, however, in enacting the broader, more detailed prohibitions of the Fair Housing Act.

■ Having determined that § 1982 affords no cause of action for the instant advertising claims, the Court finds no authority to grant a more expansive interpretation of § 1981. Section 1981 provides as follows:

> All persons within the jurisdiction of the United States shall have the same right ... to make and enforce contracts ... as is enjoyed by white citizens....

Because of the historic interrelationship of §§ 1981 and 1982, courts have consistently construed these statutes together. *See Tillman v. Wheaton-Haven Recreation Association*, 410 U.S. 431, 93 S.Ct. 1090, 35 L.Ed.2d 403 (1973); *McCrary v. Runyon*, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976). Thus, if § 1982's guarantee of an equal right to rent property does not apply to plaintiff's advertising claims, then § 1981's guarantee of an equal right to make contracts to rent property should not apply to such claims.

Similarly to § 1982, § 1981 has been interpreted to apply to refusals to enter into contracts with blacks, and not more subtle discouragements. *See, e.g., Runyon v. McCrary, supra.* While plaintiffs cite *Runyon* to support their claim, in fact *Runyon* involved defendants' direct refusal to enter into a contract with black applicants. Defendant private school was held liable under § 1981 because it denied two prospective students' admission based on race. While it is true that one of the plaintiffs did not complete a formal application, her parent was informed by the defendant that the school would not admit any black applicants. Thus, the plaintiff was effectively denied the right to contract for educational services.

Such case presents a far different issue than if defendant had merely published an advertisement indicating a preference for white students.

While admittedly such conduct would be discriminatory, it would not deny plaintiff the right to enter a contract. Thus, the Court finds that § 1981 does not create a cause of action for the instant advertising claims.[1]

*Conclusion*

Based on the foregoing reasons, judgment will be entered in favor of plaintiff HOME on its fraud claim and in favor of both plaintiffs on their Fair Housing Act claim. Judgment will be entered in favor of defendants on the claims under 42 U.S.C. §§ 1981, 1982.

An appropriate order shall issue.

### JUDGMENT ORDER

For the reasons stated in the memorandum this day filed and deeming it proper so to do, it is ADJUDGED, DECREED and ORDERED as follows:

1. Judgment is granted in favor of plaintiff HOME against the defendants on its state law fraud claim, and it is further ADJUDGED and DECLARED that the defendants' advertising practices in causing to be printed and distributed a brochure designated as *Lifestyle* ordered by defendant General Services Corporation to be reprinted on or about June 15, 1983, and described more fully in the Court's memorandum, is violative of Section 3604(c) of the Fair Housing Act, 42 U.S.C. § 3601 et seq. The 1983 conciliation agreement between HOME and the defendants is hereby declared null and void and stands rescinded.

---

1. The Court notes, in conclusion, that its decision not to recognize §§ 1981 and 1982 as creating a cause of action for discriminatory advertising in the instant case is of limited practical effect here. The Court has already held that plaintiffs have proven a Fair Housing Act violation based on the same facts and awarded them compensatory, but not punitive, damages. Identical damages are sought for the alleged § 1981 and § 1982 violations. Because plaintiffs would not be entitled to recover double damages, the Court's ruling on the scope of Sections 1981 and 1982 has limited practical significance.

2. On plaintiffs' claim under the Fair Housing Act, 42 U.S.C. § 3604, judgment is herewith entered in favor of plaintiff HOME against the defendants in the sum of Twelve Thousand Three Hundred Dollars ($12,300), and the defendants shall offset from said sum Two Thousand Dollars ($2,000) representing the monies received by plaintiff HOME in connection with the 1983 agreement referred to in paragraph 2 of this Judgment Order. Plaintiff HOME shall be entitled, in addition to its taxable costs, to interest on the net judgment sum of Ten Thousand Three Hundred Dollars ($10,300) at the rate of 6.30% per annum from this date until paid.

Judgment is herewith entered in favor of plaintiff Renee J. Saunders against the defendants in the sum of Two Thousand Five Hundred Dollars ($2,500) with interest from this date at the rate of 6.30% per annum until paid. Defendants shall pay said plaintiffs' taxable costs.

3. Judgment is hereby entered for defendants on plaintiffs' claims under 42 U.S.C. §§ 1981, 1982.

4. The Court is without adequate information to determine plaintiffs' entitlement to attorneys' fees under 42 U.S.C. § 3612(c), which requires a showing of plaintiffs' financial inability to pay such fees. Should plaintiffs wish to pursue a claim for fees, they are hereby ordered to submit appropriate affidavits in support of their claim within fifteen (15) days of the date of this order. In such event, defendants will have fifteen (15) days from the receipt of plaintiffs' affidavits to submit any rebuttal evidence. Unless plaintiffs submit the required affidavits within such time, no attorneys fees will be allowed.

Let the Clerk send a copy of this judgment order, along with the accompanying memorandum, to all counsel of record.